658 So.2d 256 (1995)
Bobby Neal SMITH, Plaintiff-Appellant,
v.
LINCOLN GENERAL HOSPITAL, et al., Defendants-Appellees.
No. 27,133-CA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 1995.
*259 Samanie, Barnes & Allen by Michael J. Samanie, Houma, for appellant.
Dollar, Price, Noah & Laird by Elmer G. Noah, II, Monroe, for appellee.
Before SEXTON, NORRIS and HIGHTOWER, JJ.
NORRIS, Judge.
Bobby Neal Smith appeals a jury verdict that dismissed his medical malpractice claim against the defendant, orthopedic surgeon Dr. James Finley, arising from a total knee replacement that was lost to infection.[1] Smith contests both the jury's substantive conclusion (rejecting his claims that Dr. Finley was negligent in failing to advise him of the risks of the procedure, in his manner of performing the operation, monitoring the patient's progress, and failing to consult with a specialist) and several of the trial judge's procedural decisions. For the reasons expressed, we affirm.

Factual background
Smith first met Dr. Finley at a hunting camp in late 1987. Smith, then 53 years old, was suffering badly from rheumatoid arthritis; he walked "drawn over" and could not straighten his knees. The two men did not discuss Smith's condition at the time; however, in August 1988 Smith came to Dr. Finley's office. By then Smith's condition had deteriorated; he was falling down a lot. Dr. Finley learned at this time that Smith was a heavy drinker and heavy smoker. He asked Smith to consider multiple joint (both hips and knees) replacement, if he would take the risk. According to Smith, Dr. Finley advised him that with surgery there was a 90% chance that he could "run deer" and get around better. Dr. Finley testified that he advised Smith he had a 5-10% chance of significant complications, including infection.
Smith ultimately decided to undergo the series of operations. He checked into Lincoln General Hospital in February 1989 and Dr. Finley replaced each hip one week apart. There were no complications from these operations. After a few weeks of recuperation at North Louisiana Rehabilitation Hospital ("NLRH"), Smith returned to Lincoln General in early April. There Dr. Finley replaced the right knee (the one that eventually got infected) on April 3, and the left knee on April 10. For several days before each operation, Smith was given a strong antibiotic, Ancef. Just prior to the right knee operation, Dr. Finley discovered on the center of that knee a lesion, such as is common in rheumatoid arthritis patients. Considering this to be an old ulcer that posed no additional risk, Dr. Finley decided not to postpone the operation but instead cut around the lesion and performed the implant. He then excised the lesion; pathology showed it contained no infected tissue.
On April 13 Smith was transferred from Lincoln General to NLRH. At this time he still had a mild temperature, an elevated white blood count and rapid pulse, but Dr. Finley felt, along with several other experts who testified, that these were normal post-operative symptoms and did not indicate infection. Smith's temperature returned to normal shortly after his admission to NLRH, and his recuperation went uneventfully until early May.
*260 On May 3, Nurse LaFollette noticed a "crater" some one-half to one centimeter deep in the incision line of Smith's right knee; she saw no drainage or other symptoms. She called her supervisor, Nurse Fontenot, who described it as a "pin hole in the center of the knee." Nurse Fontenot phoned Dr. Finley who, before coming to look at the wound, prescribed an oral antibiotic, Keflex, and twice-a-day dressing changes. Nurse Fontenot testified that Dr. Finley checked in on Smith later that evening, at which time the wound was still a "pin hole" with no signs of infection. Dr. Finley declined Nurse Fontenot's suggestion to take a culture of the wound; he felt this was a normal "dehiscence" (separation of a healing wound at the edges) and that the Keflex would take care of any potential superficial infection.
The following day, May 4, Nurse Logan looked at Smith's knee and noted, "Very red around the puncture-type wound. Firm to the touch. Yellowish scab * * * extremely foul odor." She cleaned and dressed the wound, and found it was not draining. She did not call Dr. Finley, as she saw from the nurses' notes that he had been notified the previous day.
On May 5, Nurse Technician Edwards checked on Smith's knee twice. For the first visit, at 7:30 a.m., she wrote only that she changed the dressing. For the second visit, at 10:40 a.m., she wrote, "Open wound at mid knee incisional line with yellow purulent drainage. Cleansed with hydrogen peroxide & Betadine." Despite this observation, she did not contact Dr. Finley. Later that day, Dr. Finley examined Smith; he described the wound as a small ulcer, such as is common in rheumatoid arthritis patients. He found no redness, swelling or fluid, or anything to suggest an infection. He did not read the nurses' notes quoted above. He discharged Smith from NLRH that day, with orders for regular visits from Glenwood Home Health Nurses, and to continue on Keflex.
For some reason not apparent from the record, Glenwood Home Health did not come to Smith's house for nine days, during which time he did not change the dressing on his knee. When Nurse Worley saw him on May 15, she found two small holes on his knee, one .5 × .5 centimeters, and the other .4 × .4 cm. She wrote that the wound was "complicated," meaning that it was producing clear yellow drainage. She did not personally advise Dr. Finley of this because she saw that Smith was already on an antibiotic; however, he received notice of her report by administrative channels.[2] Two days later, Nurse Fleming also found two holes, which she estimated as 1 and .5 cm wide, .5 cm deep, and about 2 cm apart. She also noted some swelling and drainage which she described as not purulent but not normal. When Nurse Fleming saw Smith for the last time on May 25, the knee was still slightly swollen and draining, and he had a low-grade fever of 99°.
In late May Smith's home health assignment was transferred to Union Home Health.[3] Nurse Skeeles visited him on May 30, noting that the wound appeared to be healed. She saw two holes, roughly .5 cm each, but no drainage, redness or swelling. She described the wound as "very clean." Because on her arrival she found Smith walking towards his car (Smith said he was actually getting out of the car), she decided he was mobile, not in need of home health nursing, and she discontinued the service. She testified that had she seen any drainage from Smith's knee on May 30, she would have continued him as a patient. Smith, however, testified that his knee was swollen and smelled bad that day. He also testified that during his home health treatment, he tried to call Dr. Finley several times. He admitted that the purpose of these calls was to complain about the home health service or to ask for more pain medication, which the doctor refused because it was narcotic; Smith never told the doctor in May that he had a new hole on his incisional line, swelling, or purulent drainage. Smith kept taking the oral antibiotic.
*261 On June 6 Smith went for his first follow-up to Dr. Finley's office. The doctor found that there was still a shallow ulcer on Smith's knee, with "necrotic debris" collected at its base. He cleaned and cauterized the wound. Smith testified that he told Dr. Finley the knee was "getting worse," but not about the foul odor he described at trial. Dr. Finley was concerned about finding an ulcer two months after surgery, but because there was no redness or swelling, and because Smith's blood tests were normal, he did not take a culture from the wound or suspect a deep-joint infection. He kept Smith on Keflex, the oral antibiotic, which all the experts agreed would be effective against many superficial infections but of little use against a deep-seeded one.
Smith testified that after this office visit, the knee got worse. Although he is hazy on the time frame, he claimed he phoned Dr. Finley's office several more times. Finally, in early July he reported that his knee was in much more pain. He returned to the office on July 7 and Dr. Finley found obvious evidence of a deep-seeded infection of the knee joint. He immediately sent Smith to Lincoln General and began aggressive intravenous antibiotic treatment with Rocephin. He also took cultures from the surface wound, but these were negative. A few days later, Smith complained of pain in the rectal area. A general surgeon, Dr. Butler, found a large perianal abscess. He lanced it but did not send the drainage to the lab.
Meanwhile, Smith's knee did not improve, and Dr. Finley placed him on yet another IV antibiotic, Cefobid. Dr. Finley re-entered the wound to insert drainage tubes. Cultures obtained thereby finally proved positive for two bacteria, Staph haemolyticus, a common laboratory contaminant of low virulence, and Streptococcus faecalis, common in the bowels and capable of causing acute infection. Despite the antibiotics and surgery, Dr. Finley was unable to save the knee. In August he removed the implant and fused Smith's knee into a slightly bent position. A culture taken at this time again revealed Strep faecalis. Smith now has no motion in his right knee.
Dr. Finley originally thought the implant must have been contaminated by contact with the lesion that he removed at the time of surgery. However, he later concluded (and maintained at trial) that it must have been infected by hematogenous spread (transmission through the bloodstream) from the perianal abscess to the knee.[4]

Procedural history
Smith filed suit in April 1990 against Dr. Finley and various other defendants, including Lincoln General and NLRH, and their insurers. Smith's original and first supplemental and amending petitions included claims of negligence and failure to obtain the patient's informed consent prior to surgery. In the course of pretrial discovery, various defendants were dismissed without prejudice, including Lincoln General, with reservation of rights against the others. In accordance with statute, Smith also filed a claim with the Patient's Compensation Fund Oversight Board. A Medical Review Panel ("MRP") convened, consisting of Drs. Baer Rambach, Myron B. Bailey and Carl Goodman. The MRP issued a report entitled "Findings and conclusions of medical review panel" rejecting each of Smith's charges against Dr. Finley. Smith subsequently settled with NLRH and its insurers and proceeded to jury trial against Dr. Finley and his insurer in February 1994. In response to a single interrogatory, the jury found by 10-2 vote that Dr. Finley was not negligent in his treatment of Smith. Judgment to this effect was entered and the instant appeal followed.

Discussion: Special jury interrogatory
By his first assignment Smith urges the trial court erred in refusing to submit a separate jury interrogatory on informed consent. Over Smith's objection, the court submitted a single interrogatory as follows:
Do you find by a preponderance of the evidence that Dr. James Finley was negligent *262 in the treatment of Bobby Neal Smith? Yes or No.
The jury marked "no," thus foreclosing the remaining questions on causation, damages and plaintiff fault. Smith now argues that because he added in his first supplemental and amending petition a claim of violation of informed consent, he was entitled to a separate interrogatory to that effect, and failure to give it was reversible error. In support he cites Steinbach v. Barfield, 428 So.2d 915 (La.App. 1st Cir.), writ denied 435 So.2d 431 (1983).
When a physician fails to disclose relevant information to the patient, and this failure to disclose causes damage to the patient, then actionable medical negligence results. La.R.S. 9:2794 A(2); Steinbach v. Barfield, 428 So.2d at 921. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. La.C.C.P. art. 1812 A. When one cause of action is asserted (such as medical malpractice by negligence) which can be proved in more than one way (as by lack of skill and informed consent), the trial court has the discretion to submit one interrogatory to the jury on the cause of action. Steinbach v. Barfield, supra; Babin v. St. Paul Fire & Marine Ins. Co., 385 So.2d 849 (La. App. 1st Cir.), writ. denied 386 So.2d 358 (1980). While it might be the better practice to submit a separate interrogatory on each theory supporting a cause of action, the matter is within the trial court's broad discretion. Steinbach v. Barfield, supra, at fn. 4. Moreover, even if the court's decision to submit one interrogatory is doubtful, the matter is subject to the harmless error rule. Id.
In Babin v. St. Paul, supra, the plaintiff in a medical malpractice action contested a special interrogatory that was worded as follows:
Was the conduct of the defendant, Dr. Abramson, below the standard of care applicable to his activities? Yes or No.
The court of appeal concluded this interrogatory was sufficient to encompass the claim of lack of informed consent. 385 So.2d at 856. We discern no appreciable difference between the interrogatory in Babin and in the instant case. Moreover, here the trial court charged the jury as follows:
If the possibility [of the risk] is one that can reasonably be anticipated and falls within the expertise of the treating physician, then the treating physician [must] so inform his patient and the failure to do so may permit you to reach the conclusion that the physician was negligent. When a patient consents to treatment but does not have sufficient information to make an informed decision concerning his treatment, the physician may be liable in negligence for a poor result. Tpp. 793-794.
The charge makes it clear that a finding of lack of informed consent is one means of finding the physician was negligent in his treatment. On this record we conclude the jury was adequately instructed in the relationship between informed consent and negligence, and the trial court did not abuse its discretion in refusing to submit the separate jury interrogatory.
We distinguish the case of Steinbach v. Barfield, supra, relied on by Smith, in that the single interrogatory there was found to track the medical malpractice statute (R.S. 9:2794 A, quoted infra) as regards lack of sufficient knowledge or skill, but to omit any language regarding reasonable care and diligence (informed consent). 428 So.2d at 922. Such an interrogatory could mislead the jury into believing that only lack of sufficient knowledge and skill creates liability. The simpler "negligence" interrogatory used in the instant case and in Babin v. St. Paul, supra, together with the jury charge, does not create this misunderstanding, and in fact permits a finding of negligence if either theory of the cause of action is proved.
Smith's first assignment lacks merit.

Lack of informed consent
By his second assignment Smith urges that in the event this court rejects the argument of his first assignment, then the jury was plainly wrong in finding that Dr. Finley complied with Louisiana's informed consent law. He contends that Dr. Finley did not advise him of the enhanced risk of infection owing to his status as a rheumatoid arthritis patient who drank and smoked *263 heavily, and cites the estimate of one expert, Dr. Rifat Nawas, that Smith was actually at 15-30% greater risk of infection than the normal population. Finally he urges, based on his own testimony, that a reasonable person would not have gone through the surgery had he been properly advised of the enhanced risk.[5]
Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved therein, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment. Hondroulis v. Schuhmacher, 553 So.2d 398, 411 (La.1988) (on rehearing); LaCaze v. Collier, 434 So.2d 1039 (La.1983), and citations therein. In a trial on the merits of a suit for inadequate disclosure of risk information by a physician, the patient must provide evidence to establish prima facie the essential elements of the cause of action. The plaintiff bears the burden of persuasion on these elements:
(1) The existence of a material risk unknown to the patient;
(2) A failure to disclose the risk on the part of the physician;
(3) That disclosure of the risk would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment; and
(4) Injury.
Hidding v. Williams, 578 So.2d 1192, 1194 (La.App. 5th Cir.1991).
The materiality of a risk depends on the existence and nature of the risk and the likelihood of its occurrence; this requires some expert testimony. Hondroulis v. Schuhmacher, supra. Materiality also means that a person in the plaintiff's position would attach significance to the particular risk; this does not require expert testimony. Hidding v. Williams, supra. The physician need not disclose risks that are not reasonably foreseeable. Hondroulis v. Schuhmacher, 553 So.2d at 413, and citations therein.
The resolution of factual conflicts is the province of the trier of fact. Martin v. East Jefferson Gen'l Hosp., 582 So.2d 1272 (La.1991); Roland v. Tedesco, 616 So.2d 780 (La.App.2d Cir.), writ. denied 619 So.2d 579 (1993). The jury's conclusions are entitled to great deference and will not be disturbed on review unless found to be manifestly erroneous or clearly wrong. Stobart v. State Through Dept. of Transp., 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The jury's decision to select one expert's view over another's is not per se reversible error. Neumeyer v. Terral, 478 So.2d 1281 (La.App. 5th Cir.1985), writ. denied 481 So.2d 631 (1986). Ultimately, the issue on review for manifest error is whether the jury's conclusion was a reasonable one. Stobart v. State, supra.
The experts were unanimous that rheumatoid arthritis patients who smoke and drink heavily are more susceptible to infection than ordinary, healthy persons. Among plaintiff's experts who testified to this effect were Dr. Martin Raff, a professor of microbiology and immunology at the University of Louisville School of Medicine, who was accepted as an expert in internal medicine and infectious diseases; Dr. James Williams, an orthopedic surgeon from New Orleans; Dr. Rifat Nawas, an orthopedic surgeon from Monroe who testified by deposition; Dr. Charles Sanders, a consulting physician from New Orleans who specializes in infectious diseases and testified by deposition; Dr. Carl Goodman, an orthopedic surgeon from Shreveport, who participated on the MRP and testified by deposition. Of these, Dr. Nawas placed the odds of post-operative infection for a *264 smoker, heavy drinker and severe rheumatoid patient at 15-30%, in contrast to a healthy person, whose risk of infection was 1-7%. Dr. Sanders set the risk of infection at 1-1½%, and described it as "not a common problem." Dr. Williams did not quantify the risk, but testified he "probably" would have advised Smith he was in a high risk category.
Defense experts who assigned Smith a risk of infection were Dr. Craig Springmeyer, an orthopedic surgeon from Shreveport; Dr. Edward Joel Septimus, an infectious disease specialist from Houston, Texas; and Dr. Myron B. Bailey, an orthopedic surgeon from Monroe, who served on the MRP. Dr. Septimus set Smith's risk of infection at 2-3%; Dr. Bailey did not quantify it, but stated that death and pulmonary embolism were greater risks in total knee replacements. Dr. Finley himself testified that according to studies available at the time, Smith's risk of infection was 1-4%, and that the infection rate for knee replacements at Lincoln General was less than 1%; he quoted Smith a 5-10% risk of "significant complications," including infection.
This evidence shows that infection is a material risk of which Smith should have been advised. The thrust of Smith's argument is that while Dr. Finley may have disclosed some risk of infection, he was negligent for not setting it as high as 15-30%. This was indeed the level of risk assigned by Dr. Nawas; however, Dr. Nawas actually said it was 15-30% higher than "regular people," whose risk of infection was 1-7%. The jury could have reasonably concluded that the resultant risk (roughly 8 or 9%) was in the same range assigned by Dr. Finley. Neumeyer v. Terral, supra. Dr. Finley obviously more than doubled the standard risk in his quote to Smith; moreover, he testified repeatedly that he advised Smith to this effect. On direct examination Smith denied that the doctor ever advised him of a risk of infection, but his admission of a "90% chance" he could run deer again corresponds with the 10% risk Dr. Finley claimed to have given. Also, on cross examination Smith conceded the "possibility" that Dr. Finley may have indeed mentioned the risk of infection. T.pp. 528-529. Under the circumstances we perceive no manifest error in the jury's decision to accept Dr. Finley's version of their pre-operative discussions and to find informed consent. Stobart v. State, supra. This assignment lacks merit.

Negligence of Dr. Finley
By his third assignment, Smith urges the jury was plainly wrong in finding that Dr. Finley was not negligent in his treatment of the plaintiff. At trial and on appeal, Smith argued that the lesion was in fact the cause of infection, and Dr. Finley deviated from the standard of care by not allowing it to heal before proceeding with the implant operation. Smith also contended that Dr. Finley breached the standard of care by failing to diagnose the infection timely and properly at its first signs of development, and by failing to consult with an infectious disease expert for the management of the infection.
In a malpractice action based on the negligence of a physician licensed under La.R.S. 37:1261 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians * * * licensed to practice in the state of Louisiana * * *; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians * * * within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.R.S. 9:2794 A.
A physician is not held to a standard of absolute precision; rather, his conduct and judgment are evaluated in terms of *265 reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events. Iseah v. E.A. Conway Mem. Hosp., 591 So.2d 767 (La.App. 2d Cir.1991), writ denied 595 So.2d 657 (1992); Broadway v. St. Paul Ins. Co., 582 So.2d 1368 (La.App. 2d Cir.1991). The mere fact that an injury occurred does not raise a presumption that the physician was negligent. R.S. 9:2794 C. The jury's findings are, of course, subject to the manifest error rule. Martin v. East Jefferson Gen'l Hosp., supra; Elliott v. Robinson, 612 So.2d 996 (La.App. 2d Cir.1993).
Excising lesion during knee replacement surgery. For the plaintiff, Dr. Raff testified that Smith had a "nodule" on his knee prior to surgery; this could be contaminated with bacteria or inflammatory cells, and cutting through it would dramatically increase the risk of infection. As a general rule, he would let the lesion heal before operating. Dr. Raff admitted that the pathology report on the excised lesion found it uninfected, but he said it could still harbor bacteria. He also admitted there was no evidence that Dr. Finley cut through the lesion. Dr. Williams testified that the standard of care is to treat every potential source of infection before operating, and that removing the lesion during surgery "possibly" created a risk. Dr. Nawas testified that if a patient had an infected lesion on the knee, he would not operate, but if the lesion was uninfected, he would just cut around it.
On the defense side, Dr. Springmeyer testified that the lesion was inactive, with no evidence of infection, and totally removing it created no hazard. Drs. Septimus and Bailey concurred that excising the uninfected lesion during surgery was not a deviation from the standard of care. Also approving Dr. Finley's procedure was Dr. Baer Rambach, an orthopedist who served on the MRP.
Dr. Finley testified that this lesion was a fold of skin that had once been an ulcer but was now fully healed; he removed it to aid healing. Both in pretrial depositions and at trial he said the presence of this "epithelialized area" did not pose any additional risk.
Dr. Finley's handling of the lesion appears to have been a matter of judgment; although the evidence easily shows that it is dangerous (and beneath the standard of care of an orthopedic surgeon) to operate when a potential source of infection is present, Dr. Finley examined the lesion and determined it was not infected. Pathology analysis proved him correct. Only Dr. Raff was adamant in saying that the knee replacement should not have proceeded; Smith's other experts, Drs. Williams and Nawas, candidly admitted they probably would have proceeded with the operation, on the evidence shown. These two witnesses, along with all the defense experts, testified that it was within the standard of care of an orthopedic surgeon to cut around an uninfected lesion and proceed with the arthroplasty. Viewed from the standpoint of manifest error, this was not clearly wrong. Stobart v. State, supra.
Diagnosis of infection. Each of the experts had a theory of how the infection occurred and when it should have been apparent to Dr. Finley. Dr. Raff, Smith's first expert on infectious diseases, testified to "a high degree of medical probability" that the knee was infected during surgery, or else from a subsequent breakdown of the incision; when Smith was discharged on April 13, his symptoms (fever of over 101°, fairly rapid pulse and slightly elevated white blood count) made it "highly likely" he was infected at that time; Dr. Raff would not have discharged Smith, but would have ordered additional tests. He further testified that in early May, when some NLRH nurses noted a "crater" and "purulent drainage" from Smith's knee, this was evidence of infection that Dr. Finley should have acted on. Dr. Raff added that the oral Keflex prescribed by Dr. Finley on May 3 was completely ineffective against a deep-joint infection and may have masked the underlying problem; he would have cultured the drainage and given IV antibiotics in high doses directed against the most likely organisms. He further testified that the perianal abscess noted at the hospital in July had nothing to do with the knee infection; even though one of the contaminants ultimately found in the knee, Strep faecalis, is common in the rectal area, there was another germ in the knee as well, *266 Staph haemolyticus; whenever multiple germs are carried through the bloodstream, the patient usually exhibits serious symptoms and high fever that Smith did not have. On cross examination Dr. Raff reiterated that the lesion was the likely source of infection in surgery on April 2. He recognized, however, that Smith was on a strong surgical antibiotic, Ancef, until April 9, and was not placed on Keflex until May 3. When asked why the infection was not raging by May 3, he replied, "I can't explain it entirely." T.p. 152.
Dr. Williams testified that the standard of care for an orthopedic surgeon performing a total knee replacement was to assume the worst (a deep-joint infection) until proven otherwise; his leading complaint with Dr. Finley was his failure to test for infection in early May, when the nurses began to note problems. He recommended aspirating the knee on May 3 or 5, "if possible," as the risk would be warranted. He would not have prescribed Keflex on May 3, and would have definitely discontinued it on May 5 after a nurse found yellowish drainage. Like Dr. Raff, he believed the Keflex may have suppressed the infection to some extent.
Dr. Nawas testified that on the basis of Smith's history that the knee had been draining since two weeks after the operation, the knee was likely infected during surgery. He admitted there were two different schools of thought among orthopedists for treating problems like Smith's: aggressive treatment, or opening the joint upon suspicion of infection; and conservative treatment with antibiotics. He said that if he had seen a high-risk patient with yellow purulent drainage for two days, he would have performed a culture. He admitted that giving Smith a broad-based oral antibiotic like Keflex on May 3 might have been acceptable, though it could have reduced the symptoms of infection. When asked, however, about the possibility that the perianal abscess may have seeded the knee, he replied affirmatively, "The majority of total joint infections have been through hematogenous infection." Nawas dep., 66.
Dr. Sanders testified that Smith might have had the infection before he left Lincoln General in April, but the symptoms noted on discharge could equally be attributed to rheumatoid arthritis. The first true sign of infection, he said, was on May 3, when Nurse LaFollette noted a "small crater." He testified that on the basis of nurses' observations of May 3-5, he would have ordered lab work, but he declined to say Dr. Finley breached any standard of care by not doing so. He also questioned Dr. Finley's decision to give Smith Keflex on May 3; many strains of Staph are resistant to it, and he would have required a follow-up sooner than June 6. He definitely would have discontinued Keflex on June 6, when Smith appeared with an ulcer on his knee. Dr. Sanders admitted, however, that even with the symptoms of June 6, he could not tell the knee was infected. He expressed no opinion as to the source of infection, but said it could not have been the perianal abscess, as the knee was obviously infected on July 7 and Smith did not complain of the abscess until July 13.[6]
Dr. Goodman testified that by "medical authority" any draining, open wound to appear after joint replacement should be cultured by the orthopedist. He also testified that based on the nurses' notes of early May, it was not acceptable to send Smith home on Keflex and with instructions to return in six weeks; however, in light of Dr. Finley's personal observation of the wound at the time, it was all right to do so. Dr. Goodman said he "probably" would have cultured the wound on June 6 and considered an IV antibiotic. Finally he explained that there can be a long lapse between a successful operation and an apparent infection; it can be months or years if the site is seeded from another area. Arthroplasty sites are particularly vulnerable to seeding.
Dr. Springmeyer, testifying for the defense, stated that Smith's symptoms upon discharge from Lincoln General (fever, white blood count) were normal for a person who had major surgery just a few days earlier, and were not evidence of infection. He also *267 testified that Smith's symptoms in early May at NLRH could have been a "suture reaction" or "wound breakdown," for which it was totally appropriate to prescribe Keflex prophylactically. There was no reason, he said, to keep Smith at NLRH, considering his symptoms, the fact he was on an antibiotic and was supposed to be looked after by Home Health nurses. When Dr. Finley next saw Smith on June 6, according to Dr. Springmeyer, the routine tests were essentially normal; the increased sedimentation rate was probably due to arthritis, not to infection. He could not determine when the knee got infected; it manifested itself between June 6 and July 7. He felt that bacteria from the perianal abscess were a "strong candidate" for seeding the knee, but said he could not determine within a medical probability what caused the infection. Dr. Springmeyer admitted that the nurses' notes from early May were quite different from Dr. Finley's own observation of the same knee, and that Home Health reports forwarded to Dr. Finley also painted a poor picture of Smith's knee; however, at best these suggested a superficial infection that could have been adequately treated by the Keflex. He doubted whether there actually was a superficial infection, as the cultures taken in early July at Lincoln General were negative. He agreed that in the event of a suspected deep-joint infection, aspirating the joint and using strong IV antibiotics was the best course, but maintained that Dr. Finley had no basis to suspect such an infection.
Dr. Rambach also approved Dr. Finley's decision to discharge Smith from the hospital on April 13 despite a lingering fever; this was probably due to bronchitis. He did not dispute the decision to prescribe Keflex prophylactically, but disagreed with Dr. Williams's conclusion that the standard of care required taking a culture from the knee at the time. Although in an earlier deposition Dr. Rambach said he would have cultured the knee on June 6, he testified at trial that this was a judgment call. Even though the perianal abscess was not diagnosed until mid-July, he felt it was "definitely related" to the knee infection. In response to questions about the nurses' notes, he testified that he had "no reason to defer to someone else's observation" when he saw the knee "looked better, knee clear."
Dr. Septimus, the infectious disease specialist from Houston, testified that post-surgical fever can last up to two weeks, and did not indicate an infection when Smith was discharged from Lincoln General; moreover, his fever dropped rapidly after he reached NLRH. In early May, according to Dr. Septimus, if Smith's drainage was purulent, he would have ordered a culture, but he preferred to rely on Dr. Finley's observation of no drainage. He further explained that poor healing or a superficial infection could account for the Home Health nurses' reports, and nothing in Dr. Finley's June 6 office report indicated a deep infection. He particularly observed that the lab work conducted that day was essentially normal. He hypothesized three ways the knee could have been infected by July 7: hematogenously, by direct extension, and at the time of surgery. He rejected surgical contamination because neither Strep faecalis nor Staph haemolyticus was present in the lesion. On the assumption that Smith's perianal abscess, which likely contained Strep faecalis, was present for a week or so before becoming symptomatic, Dr. Septimus concluded that it seeded the knee; this was the "overwhelming probability." He added that the oral antibiotic Keflex, which Smith took from May 3 on, would not mask Strep infection, and in fact would have no effect on it whatsoever. Finally, he testified that if Strep had been present in the joint on May 6, then a "hot, swollen knee" would have appeared much faster, and would not have responded to Keflex. On cross examination, Dr. Septimus admitted he was not certain how the Staph infection got to Smith's knee, but noted that it is a common lab contaminant which did not appear in the August 1989 culture.
Dr. Bailey, who served on the MRP, testified that knee replacement patients can expect post-surgical fever for about 10 days; Smith's condition on April 13 was not such that he needed to be kept at Lincoln General. He also said a surgical incision can exhibit "dehiscence," or separation around the edges, without being infected, and this is what Nurse LaFollette was describing on *268 May 3. Dr. Bailey testified it was within the standard of care to prescribe Keflex in the hope of preventing complications, and no culture was necessary on May 3. He also considered multiple factors in causing the infection, but as he was almost certain that the perianal abscess contained Strep faecalis, he concluded that seeding from the abscess was the "probable source."
Dr. Finley himself testified that in early May Smith exhibited "classical wound dehiscence" or delayed healing that occurs in rheumatoid patients; while it is not evidence of infection, any open wound will drain. By May 5 the wound looked good enough that he could send Smith home under the care of Home Health nurses. Commenting on some of those nurses' observations, Dr. Finley stated that Smith allowed the wound to deteriorate by not changing the dressing for 10 days, but that after proper cleaning and dressing was started, the wound improved (Nurse Skeeles said it had healed by May 30). On the June 6 office visit, Dr. Finley found a "small open area" which he cleaned and cauterized; however, no redness or swelling was present, and Smith's blood work was normal, so the doctor still did not suspect infection at the time. He also did not consider changing medication.
From this mass of evidence the jury could reasonably have found that Smith's knee got infected either because of something Dr. Finley did in surgery or because of hematogenous spread from the unrelated perianal abscess. While Dr. Raff was resolute in ascribing the infection to the knee lesion, and Dr. Septimus strongly favored the perianal abscess, most of the others (Sanders, Goodman, Springmeyer and Bailey) were hesitant to say either source was a medical probability. We admit some difficulty understanding how an abscess near the anus and not reported by Smith until July 11 could have so thoroughly infected the right knee before July 7. However, the common presence of Strep faecalis in both sites is strong evidence that they are related; there was no other explanation of how this common bowel germ could have reached the knee. The alternative theory of contamination from the knee lesion is also problematic; if Strep and Staph germs had been present in the knee since surgery on April 2, and surgical antibiotics were discontinued on April 10, it is difficult to see why an obvious, full-blown deep-joint infection was not present by early May or early Junea discrepancy that even Dr. Raff was at pains to explain. In light of this difficult and contradictory evidence, the jury would not have been plainly wrong to reject Smith's theory of how and when the infection occurred, and to accept Dr. Finley's. Stobart v. State, supra. The result is that there was no infection to detect until early July, and Dr. Finley was not negligent in failing to detect one sooner.
Moreover, the May and June observations of Smith's knee were also conflicting. Several nurses at NLRH described a bad looking wound with smelly, purulent drainage; at the same time, Dr. Finley reported a healthy and healing knee. The experts like Drs. Sanders and Goodman, who recommended taking cultures in early May, admitted that Dr. Finley's findings did not mandate a diagnosis of deep-joint infection. The same applies to Smith's June 6 office visit. While Smith described a weeping, smelling, aching wound at trial, there is no evidence that he voiced these complaints at the time.[7] His further testimony that he phoned the doctor's office several times before July 7 fades in significance when he admitted on cross examination that he placed only one call between June 6 and July 7, and that was to request medication, not to report a weeping, smelling wound. T.p. 554.
On this record the jury was not plainly wrong to find, despite the conflicting evidence, that Dr. Finley was not negligent for not diagnosing Smith's deep-joint knee infection any sooner. We perceive no manifest error. Stobart v. State, supra.
Consultation with an infectious disease expert. Dr. Raff, an infectious disease *269 ("ID") specialist, testified that on May 6, if there was any doubt in Dr. Finley's mind, he should have consulted an ID expert, as he was "in need of help." On cross examination, Dr. Raff reiterated that Dr. Finley was wrong in his early May diagnosis. Dr. Sanders, another ID specialist, stated that the decision to call an expert "depends on how much the orthopedic surgeon knows about infections, how comfortable he feels about it," and noted there was no ID expert in Ruston. When asked if Dr. Finley should have called one in early May, Dr. Sanders replied, "Maybe, or maybe not." Sanders dep., 45. Dr. Williams, an orthopedic surgeon, testified that on the facts presented, calling a specialist in early May was "a very individual thing," although he believed he would have called one. T.p. 202. Dr. Goodman, an orthopedist, testified that on the basis of NLRH nurses' findings of yellow, purulent, smelly drainage (symptoms that Dr. Finley never observed), the standard of care would have been to call an ID expert, but this was essentially a judgment call on the physician's part. Dr. Springmeyer, a defense witness whose office is in Shreveport, testified that he often consults with an ID specialist in Shreveport. T.p. 1106.
For the defense, Dr. Rambach echoed Dr. Sanders's concern that there is no ID expert in Ruston; he was aware of one in Shreveport, but he would not consult unless he could see the patient in person. Dr. Rambach concluded that under the circumstances there was no obligation to consult. Dr. Septimus repeated another of Dr. Sanders's statements, consultation "depends upon the comfort level of the orthopedic surgeon," and on the availability of an ID doctor. T.p. 447. He did not think Dr. Finley was negligent for failing to get a referral. Finally, Dr. Bailey testified that he would not consider seeking a consultation until he had a confirmed diagnosis of infection, and noted there was no ID specialist in the Ruston area.
In the face of this conflicting evidence, the jury was certainly entitled to find that Dr. Finley was not obligated to consult an ID specialist. Notably, the two experts who recommended it the most, Drs. Raff and Springmeyer, came from larger communities where such specialists were readily available. Dr. Rambach suggested a consultation would be of little use unless the ID expert could see the patient personally, which was obviously not feasible. Moreover, the jury apparently accepted Dr. Finley's theory that the deep-joint infection did not set in until early July; in that event, there was no reason to suspect a deep infection and probably nothing the ID specialist could have done. On this record we perceive no manifest error. Stobart v. State, supra.
This assignment lacks merit.

MRP Opinion and reasons
By his fifth assignment Smith urges the trial court erred in admitting, over his objection, the written reasons for the MRP's conclusion. In support he cites La.R.S. 40:1299.47 H, which provides that "[a]ny report of the expert opinion reached by the medical review panel shall be admissible as evidence[.]" He argues that permitting the jury to take the MRP's written conclusions into the jury room is equivalent to letting them take in a medical deposition; it creates the possibility that jurors will disregard their own recollection of the testimony and place more emphasis on the written evidence before them. In response, Dr. Finley argues that another portion of the statute, § 1299.47 G, specifically provides that the MRP's expert opinion is to be accompanied by "written reasons for their conclusions."
The pertinent portions of the statute provide as follows:
G. The panel shall have the sole duty to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care. After reviewing all evidence and after any examination of the panel by counsel representing either party, the panel shall, within thirty days but in all events within one hundred eighty days after the selection of the last panel member, render one or more of the following expert opinions, which shall be in writing and signed by the panelists, together with written reasons for their conclusions:

*270 (1) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.
(2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.
(3) That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court. * * *
H. Any report of the expert opinion reached by the medical review panel shall be admissible in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness. * * * (emphasis supplied to portion added by La.Acts 1990, No. 967)
By the 1990 amendment to Subsection G, the MRP's bare conclusion obviously must be "together with" the written reasons therefor. Inferentially Smith contends that because Subsection G specifically mentions the reasons for the conclusions, and Subsection H (setting forth admissibility) does not, then the legislative intent must be to exclude the reasons from admissibility. However, this narrow construction is not persuasive. It would be absurd for Subsection G to define the MRP's duty as one of rendering an opinion "together with written reasons," and then for Subsection H to deny admissibility of the MRP's work product. In fact, the "Findings and conclusions of medical review panel" in the instant case, admitted as Exhibit D-1, comply with Subsection G in that it is a single document in which each conclusion is followed by the applicable reasons. We cannot conceive that the report must be dissected before the jury can consider it.
We also observe that Smith's analogy to the use of depositions in the jury room is misplaced. The Code of Civil Procedure specifically prohibits such use of depositions, but allows the use in deliberations of "any object or writing received in evidence" subject to certain exceptions not applicable here. La.C.C.P. art. 1794 B. The report of the MRP's expert opinion "together with written reasons for their conclusions" is a writing which the jury may take into deliberations under art. 1794.
Finally we note that each of the doctors who participated on the MRP also testified extensively, describing the evidence he reviewed, the theories he considered and the reasons for his ultimate conclusion. One of them, Dr. Goodman, actually testified for the plaintiff. Any potential prejudice arising from the jury's use of the MRP reasons was minuscule. This assignment lacks merit.

Peremptory challenges
By his fourth assignment Smith urges that Dr. Finley's counsel exercised his peremptory challenges in jury selection in a manner that violated the United States equal protection clause of the Fourteenth Amendment as it relates to race. He contends that counsel used each of his peremptory challenges against black venire members in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Specifically he contests the explanations offered by counsel, and accepted by the court, for challenging prospective jurors Larry Gray, Mary Franklin and Neva Edmonds.
A civil litigant may raise the equal protection claim of a person whom the opposing party has excluded from jury service on account of race. Edmonson v. Leesville Concrete, 500 U.S. at 629-31, 111 S.Ct. at 2088. The approach for analyzing such claims of discrimination is identical to the one used in criminal cases. Id.; Batson v. Kentucky, 476 U.S. at 96-97, 106 S.Ct. at 1722-1723. The litigant must first make a prima facie case of racial discrimination by showing a pattern of strikes against members of a particular race. Edmonson v. Leesville Concrete, supra. Once the litigant makes his prima facie case, the burden shifts to the opposing party to come forward with a neutral explanation for challenging the black venire members; counsel must "articulate a neutral explanation related to the particular case to be tried." Batson v. Kentucky, *271 supra. The explanation need not rise to the level of a challenge for cause, but must be more than the vague belief that the prospective juror would vote a certain way because of his or her race. State v. Tucker, 591 So.2d 1208, 1215 (La.App.2d Cir.1991), writ denied 594 So.2d 1317 (1992). With the litigant's prima facie case and the opposing party's rebuttal, the trial court must determine whether the litigant has established purposeful discrimination. The trial court's determination is entitled to great discretion. Id.; State v. Collier, 553 So.2d 815 (La.1989); State v. Powell, 598 So.2d 454, 461 (La. App.2d Cir.1992); United States v. Forbes, 816 F.2d 1006 (5th Cir.1987).
Counsel for Dr. Finley conceded that he had exercised each of his peremptory challenges against African Americans. R.p. 737. On this showing the trial court was not plainly wrong to find that Smith made a prima facie case of discrimination. The issue is therefore whether the court was entitled to accept as racially neutral the explanations offered by Dr. Finley's counsel.
On voir dire, Larry Gray testified he was 40 years old, employed by J. Graves Insulation in Shreveport, and divorced with three kids. He stated that a doctor had removed a ganglion from his wrist, and "he had a bad attitude and he was real rude toward me." He complained that the doctor did not answer his questions, but stated he did not necessarily think Dr. Finley was like that. Later, in explaining the challenge, counsel for Dr. Finley said that Gray had raised his hand in reference to "bad experiences with doctors" and showed reluctancy about the medical profession. Gray's experience and apparent suspicion toward doctors is a racially neutral ground for challenging him peremptorily. See State v. Mamon, 26,337, p. 19 (La.App.2d Cir. 12/16/94), 648 So.2d 1347, 1359, and citations therein.
Venire member Mary Franklin testified that she was 33 years old and married to an independent insurance agent; she used to help him out at the office, but does not any longer. In explaining his challenge, counsel stated that both Mrs. Franklin and her husband work in the insurance business and could be biased either against the plaintiff or for the plaintiff. The possibility of bias because of her former and current connection with insurance is a racially neutral ground for exercising a peremptory challenge.
Neva Edmonds testified on voir dire that she was 67 years old, a retired cook from Ruston Elementary School, with five children in their 30s and 40s. She had a heart attack about two months earlier and had a pacemaker installed, but said she was feeling fine now. She was treated by Dr. George Smith at the Green Clinic, where Dr. Finley is a partner. She has been satisfied with his treatment of her, but he advised her to avoid stressful situations. She felt, nevertheless, that jury service would not bother her. Her mother has rheumatoid arthritis, but she herself does not. Counsel for Dr. Finley explained his challenge by citing her recent heart attack and frail condition, and described her speech as slightly slurred and her mouth slightly drawn. Counsel for Smith disputed this observation, but given the trial judge's superior vantage point to observe Mrs. Edmonds's demeanor, we will defer to the court's finding. Batson v. Kentucky, 476 U.S. at 98, 106 S.Ct. at 1724. Also, a medical admonition for a prospective juror to avoid stress is a valid, racially neutral explanation for challenging her. State v. Powell, 598 So.2d at 462; cf. State v. Mamon, p. 18, 648 So.2d at 1359. Finally, Mrs. Edmonds's mother suffers from the same disease that caused Smith's problems; this is a potential source of bias for which counsel was entitled to exercise a peremptory challenge.
In short, we find no abuse of the trial court's discretion in accepting the explanations offered by Dr. Finley's counsel for his exercise of peremptory exceptions. This assignment lacks merit.

Conclusion
For the reasons expressed, we affirm the jury verdict and judgment of the trial court at Bobby Neal Smith's cost.
AFFIRMED.
NOTES
[1] Doctor Finley's insurer, Medical Protective Company, was also a defendant and is an appellant.
[2] Department of Health and Human Services Medical Update (Form 486) and Home Health Certification (Form 485), both of which were initialled by Dr. Finley in late May. Ex. P-7, 8.
[3] Glenwood Home Health, located in West Monroe, was quite far from Smith's home in Farmerville. Union Home Health was much closer.
[4] We will summarize the remainder of the expert medical evidence in the discussion of Smith's second and third assignments of error.
[5] Just prior to undergoing the knee operations Smith signed a Surgical Consent Form at Lincoln General. This recites that the possibility of complications has been fully explained to the patient, and appears to comply with Louisiana's informed consent statute, La.R.S. 40:1299.40. It does not, however, list infection as a potential complication, and the fact that the patient signed a consent form does not preclude a finding of lack of informed consent. Hondroulis v. Schuhmacher, infra. We have therefore reviewed the issue using the expert and lay testimony, not the consent form.
[6] This was actually the date that Dr. Butler lanced the abscess. According to Dr. Butler, Smith first complained of rectal pain on July 11.
[7] He also testified that a week earlier, when Nurse Skeeles visited him at home, the knee was draining, swollen, and smelled bad. Nurse Skeeles, however, testified there was no draining and the wound appeared to be healed. The issue of Smith's credibility was certainly before the jury.