WILLIAMS, J.
 

 b The plaintiff, Maria Lowrey, appeals a judgment in favor of the defendants, Blaine Borders, M.D. and Louisiana Medical Mutual Insurance Company. The jury found that the plaintiff had given her informed consent to the surgery and that Dr. Borders did not breach the standard of care. For the following reasons, we affirm.
 

 FACTS
 

 On the morning of February 23, 2000, 37-year-old Maria Charlotte Lowrey was transported by ambulance to the emergency room of the St. Francis Medical Center in Monroe, Louisiana. The emergency room report reflects that she complained of left facial numbness, vertigo and nausea. Her medical history included a prior heart surgery to correct tachycardia. Dr. Dennis Sullivan examined Ms. Lowrey and then asked Dr. Thomas Gulick, a neurologist, to evaluate her for a possible neurological problem.
 

 Dr. Gulick ordered a CT scan of Ms. Lowre/s head and chest, along with an MRI scan of her head. The tests were performed that afternoon and the brain scans were negative. Dr. John Barraza, a radiologist, evaluated the CT scan of Ms. Lowrey’s chest. Dr. Barraza reported the CT findings as “suspicious for a small limited Type II dissection of the ascending aorta.” However, he stated that the findings were not convincing and suggested the CT scan be repeated later.
 

 
 *638
 
 Because of the serious nature of a possible dissection, or tear, of the aorta, Dr. Gulick consulted Dr. Blaine Borders, a cardiac surgeon, and Dr. Han, a cardiologist. Dr. Han ordered an MRI scan of Lowrey’s aorta that was cancelled when Dr. Borders took the consult. A second CT scan was |2performed and was again interpreted by Dr. Barraza as suspicious for an aortic dissection. Dr. Borders agreed that the scan showed an abnormality, but observed that Ms. Lowrey did not fit the typical presentation of a patient with an aortic dissection because she did not have chest pain or shock.
 

 Dr. Borders ordered an aortogram to further diagnose Ms. Lowrey’s problem. At 8:00 p.m. on February 23, 2000, Ms. Lowrey signed a written consent to a surgical procedure described as “ascending aortic repair/ replacement,” to be done if the aortogram was positive for dissection. The consent form listed several risks from the procedure, including death, brain damage, quadriplegia, loss of arm or leg and disfiguring scars. The aortogram showed no evidence of an aortic dissection. Dr. Borders next ordered a transesophageal echocardiogram (TEE). In his deposition, Dr. Borders explained the differences of the tests:
 

 [CT] scans are a hundred percent sensitive for finding an aortic dissection, but they’re only ninety-six percent specific.... If there’s an aortic dissection there and it shows it on the [CT] scan, ... a hundred percent of the time it’s possible, but ... it can show it on a[CT] scan and five percent or four percent of the time it not be an aortic dissection ... Aortography has the other flip side to it, that it’s only ninety-five percent specific, but it’s a hundred percent sensitive if it’s there, okay, but if it’s not there on the aortography, there is a chance that it is there.
 

 The TEE test showed no abnormality but, as Dr. Borders explained in his deposition, this test was the least sensitive of the tests for the aortic area in question. With the cause of Ms. Lowrey’s symptoms still unclear, Dr. Borders admitted her to the intensive care unit on beta-blocker therapy and scheduled another CT scan for the next day.
 

 On the morning of February 24, 2000, Ms. Lowrey was complaining |sof chest pain. The third CT scan was performed and interpreted by Dr. Barraza, who reported, “Findings within the ascending aorta persist on three studies and must be considered an aortic dissection (DeBakey Type II).” Because an aortic dissection is a life-threatening problem if left untreated, the CT scans all showed an abnormality in Ms. Lowrey’s aorta, and Ms. Lowrey had begun to complain of chest pain, Dr. Borders opined that the only way to conclusively rule out the condition was to perform a mediastinal exploratory sternoto-my. When Dr. Borders performed the operation, he found that Ms. Lowrey’s aorta was normal. Both Dr. Borders and Dr. Barraza later explained that the abnormal appearance of the aorta shown on the CT scans was probably the result of a pulsation artifact caused by the movement of the aorta during the CT scan.
 

 Shortly after Ms. Lowrey was discharged from the hospital, she sought a medical review panel (MRP) regarding the actions of the hospital and the doctors. The panel found no breach of the standard of care by the hospital, Dr. Borders or Dr. Barraza. The panel issued an opinion finding that the evidence did not support the conclusion that Dr. Borders failed to meet the applicable standard of care in treating Ms. Lowrey. The panel stated the following reasons for this conclusion:
 

 A CT scan of the chest was performed three (3) times within twenty-four (24)
 
 *639
 
 hours. Each of these studies showed similar findings such that diagnosis of aortic dissection of the ascending aorta must be considered.
 

 Additional studies were performed in an attempt to confirm a diagnosis of aortic dissection of the ascending aorta which were appropriate. However, even though these additional studies were negative, a diagnosis of aortic dissection of the ascending aorta could not be ruled out.
 

 14The panel does not know the extent of the discussion between Dr. Borders and the patient regarding the results and diagnosis.... Under these circumstances and with the deadly consequences of not repairing a torn aorta, there was no deviation below the standard of care even if Dr. Borders did not discuss with the patient the percentages of false positive or false negative of echocardiograph or ateriography. Dr. Borders made his decision on the most accurate test for diagnosis of aortic dissection of the ascending aorta, namely the CT scan of the chest, which was appropriate under the circumstances.
 

 In May 2002, the plaintiff, Ms. Lowrey, filed a petition for damages against the defendants, Dr. Borders, his medical malpractice insurer, Dr. Barraza, Radiology Associates and their insurer, St. Paul. The plaintiff alleged that Dr. Borders and Dr. Barraza breached the applicable standard of care in failing to properly diagnose and treat plaintiff. In 2003, Dr. Borders and his insurer filed a motion for summary judgment, which was denied by the district court. In 2004, plaintiff moved for a partial summary judgment alleging that defendants failed to obtain her informed consent to the surgery. The court also denied the plaintiffs motion. In 2006, Dr. Barra-za, his employer and their insurer filed a motion for summary judgment seeking dismissal from the lawsuit. The district court granted the motion and this court affirmed.
 
 Lowrey v. Borders,
 
 41,852 (La.App.2d Cir.3/7/07), 954 So.2d 238,
 
 writ denied,
 
 07-0722 (La.5/18/07), 957 So.2d 156.
 

 Prior to trial, plaintiff filed a motion in limine to exclude from evidence that portion of the panel opinion finding informed consent. The court denied the motion. After trial, the jury found that plaintiff had given informed consent to the surgery and that Dr. Borders had satisfied the standard of care for cardiovascular surgeons in his treatment of plaintiff. The trial court rendered judgment in favor of Dr. Borders, dismissing the [ ^plaintiffs claims. The plaintiff appeals the judgment.
 

 DISCUSSION
 

 The plaintiff contends the trial court erred in admitting into evidence that portion of the MRP opinion regarding informed consent. Plaintiff argues that this evidence should have been excluded because the MRP lacked knowledge of the extent of defendant’s discussion with plaintiff about the surgery. Any report of the expert opinion reached by the medical review panel shall be admissible in any action subsequently brought by the claimant, but such expert opinion shall not be conclusive. LSA-R.S. 40:1299.47(H).
 

 In the present case, the trial court denied the plaintiffs motion in limine to exclude a portion of the MRP opinion, which was admissible under Section 1299.47(H). Subsequently, the trial court instructed the jury that although the MRP opinion had been admitted into evidence, that opinion was not conclusive as to the jury’s determination regarding the degree of care provided by defendant. The court stated that the jury must consider the MRP opinion along with the other evidence and that, as with any other expert opinion, the jury could accept or reject the panel opinion
 
 *640
 
 depending on various factors, including the assumptions upon which the MRP reached its decision.
 

 At trial, the plaintiff cross-examined Dr. David Hamm, a member of the MRP, regarding the evidence considered by the panel. The plaintiff raised for the jury the apparent misconception of Dr. Hamm that prior to surgery, Dr. Borders believed that an aortic dissection most likely existed, | ^contrary to Dr. Borders’ trial testimony. In light of the court’s instruction and the testimony, the jury was able to weigh the probative value of the MRP opinion along with the other evidence presented in making a determination on the issue of informed consent. Thus, we cannot say the trial court erred in admitting the MRP opinion into evidence. The assignment of error lacks merit.
 

 Informed Consent
 

 The plaintiff contends the jury erred in finding that plaintiff gave informed consent to the exploratory surgery. Plaintiff argues the consent was inadequate where the defendant did not inform plaintiff there was a 95% medical certainty that an aortic dissection was not present, that the exploratory sternotomy itself could be fatal or that another diagnostic test, an MRI, was available to help determine whether a dissection existed.
 

 A doctor is required to provide the patient with sufficient information to permit the patient to make an informed and intelligent decision on whether to submit to a proposed course of treatment.
 
 Hidding v. Williams,
 
 578 So.2d 1192 (La.App. 5th Cir.1991). Where circumstances permit, the patient should be told the nature of the pertinent illness or condition, the general nature of the proposed treatment or procedure, the risks involved therein, the prospects of success, the risks of failing to undergo any treatment or procedure at all and the risks of any alternate methods of treatment.
 
 Smith v. Lincoln General Hospital,
 
 27,133 (La.App.2d Cir.6/21/95), 658 So.2d 256,
 
 writ denied,
 
 95-1808 (La.10/27/95), 662 So.2d 3.
 

 In the present case, Dr. Borders testified that on February 23, 2000,17the plaintiff signed a written consent for surgery to repair a torn aorta that would be necessary if a scheduled aortogram was positive for aortic dissection. However, the aorto-gram results were negative and Borders did not proceed with surgery since a dissection was not confirmed. Dr. Borders stated that prior to surgery on February 24, 2000, he again met with plaintiff and they discussed her situation, which involved three abnormal CT scans, the opinion of several radiologists that an aortic dissection was indicated and her chest pain that day.
 

 In addition, Dr. Borders testified that his preoperative note dated February 24, 2000, accurately reflected his conversation with plaintiff. The note stated that Dr. Borders conducted lengthy discussions with the plaintiff and her family, that he felt the plaintiff needed to undergo the sternotomy to rule out aortic dissection, that he described the risks of aorta repair surgery and that plaintiff “understands the risks and benefits in detail and desires to proceed this evening, 2/24/00.”
 

 The plaintiff testified that on February 24, 2000, Dr. Borders did not advise her that there was only a five percent chance of her having a torn aorta. Plaintiff stated that if she had known there was such a small chance of a torn aorta, she would not have consented to the surgery. The plaintiff testified that Dr. Borders convinced her that she did have a torn aorta despite conflicting test results, because Dr. Borders said the CT scans were the definitive tests. Plaintiff stated that Dr. Borders said he was going to operate to repair or
 
 *641
 
 replace the torn aorta and that he discussed the risks and benefits of the surgery, but that she was never told the surgery was 1¡¡exploratory. The plaintiff testified that she agreed to undergo surgery on February 24th, but only because she thought she would die if she did not have the procedure.
 

 The medical records include a nurse’s note dated 2-24-00, stating that a nurse spoke with plaintiff at length regarding the pending surgery and allowed time for questions. In addition, the nursing record for the mediastinal exploration procedure included a box titled “Special Considerations-check when implemented.” A check mark is placed next to the statement “Clear concise explanations given to pt/family.”
 

 The jury heard conflicting testimony regarding the discussions between the plaintiff and Dr. Borders prior to the surgery performed on February 24, 2000. The jury implicitly accepted Dr. Borders’ description of his conversations with plaintiff in finding that she failed to prove that he did not properly advise her concerning the risks and benefits of surgery for a suspected aortic dissection. Based upon this record, we cannot say the jury was clearly wrong in finding that Dr. Borders obtained the plaintiffs informed consent for the surgical procedure. The assigned error lacks merit.
 

 Negligence
 

 The plaintiff contends the jury erred in finding that the treatment by Dr. Borders did not fall below the applicable standard of care. Plaintiff argues that Dr. Borders was negligent in failing to order an MRI scan to rule out an aortic dissection before operating.
 

 In a medical malpractice action based upon the negligence of a licensed physician, where the defendant practices in a particular specialty |fland the alleged acts of medical negligence raise issues peculiar to that specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the same medical specialty. The plaintiff must also prove that the defendant either lacked this degree of skill or failed to use reasonable care and diligence in applying that skill. LSA-R.S. 9:2794;
 
 Smith v. Lincoln General, supra.
 

 A physician is not held to a standard of absolute precision. Rather, his conduct and judgment are evaluated in terms of reasonableness under the existing circumstances, not on the basis of hindsight. Credibility determinations, including the evaluation of expert testimony, and the ultimate issue of whether a plaintiff has satisfied the burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal absent manifest error.
 
 Roberts v. Cox,
 
 28,094 (La.App.2d Cir.2/28/96), 669 So.2d 683.
 

 In the present case, the plaintiff presented the testimony of Dr. James Weiss, a cardiologist who was board certified in cardiovascular disease. Dr. Weiss testified that he had made diagnostic decisions involving patients with aortic dissections, but had not performed the surgical procedure to repair a torn aorta. Dr. Weiss stated that he had reviewed the plaintiffs medical records to assess the appropriateness of Dr. Borders’ decision to operate. Dr. Weiss opined that because the evidence of the presence of an aortic dissection was minimal, the exploratory surgery by Dr. Borders was premature and a breach of the standard of care. Dr. Weiss stated that although the CT scans and plaintiffs complaints of vague chest and hoshoulder pain indicated an aortic dissection, the results of other valid tests, the aortogram and TEE, did not show evidence of a dissection. Dr. Weiss testified that Dr. Borders should have ordered an
 
 *642
 
 MRI study to confirm or refute the diagnosis of dissection before performing the surgical procedure. Dr. Weiss acknowledged that he had not reviewed the actual CT films that were taken and that patients with aortic dissections can present with a wide variety of symptoms depending on the nature and severity of their conditions and do not always have a sudden onset of searing chest pain.
 

 Dr. David Hamm, a board-certified thoracic surgeon, testified that Dr. Borders chose him as a member of the MRP and that he agreed with the panel’s conclusion that the evidence did not show that Dr. Borders breached the standard of care in treating the plaintiff. Dr. Hamm stated that in addition to the three consecutive suspicious CT scans within a 24-hour period, the plaintiffs complaints of pain in her chest and between the shoulder blades were consistent with aortic dissection. Dr. Hamm testified that although the TEE and aortogram results were normal, the TEE would have difficulty picking up a tear in the location of the suspected dissection and the aortogram was less sensitive than the CT scan. In addition, Dr. Hamm stated that even if an MRI study had been done and did not show a torn aorta, Dr. Borders would have possessed more information, but would have faced the same decision because the three CT scans suspicious for aortic dissection could not be discounted. Dr. Hamm opined that Dr. Borders complied with the standard of care for cardiovascular surgeons.
 

 Dr. Robert White, who was accepted as an expert in thoracic surgery, |n testified that the hospital records showed that within a 24-hour period, Dr. Borders had examined the plaintiff several times, had reviewed various diagnostic tests, had discussed the CT scans with several radiologists and had given the plaintiff options. Dr. White stated that in his experience diagnosing an aortic dissection could sometimes be very difficult and that Dr. Borders properly did not hurry into the decision to operate, but ordered a repeat CT scan and other diagnostic tests. Dr. White testified that he did not agree with Dr. Weiss that an MRI test could necessarily have ruled in or out an aortic dissection. Dr. White stated that in addition to the CT scans, the plaintiffs complaints of chest pain and interscapular pain were consistent with a torn aorta. Dr. White opined that Dr. Borders complied with the standard of care for cardiovascular surgeons in treating the plaintiff.
 

 The jury heard conflicting testimony regarding the appropriateness of Dr. Borders’ treatment of plaintiff and whether the administration of an MRI scan would have conclusively ruled in or out the presence of an aortic dissection. The jury considered the medical evidence and weighed the credibility of the witnesses. Based upon this record, the jury could have reasonably found that Dr. Borders was not negligent in recommending exploratory surgery to conclusively rule out an aortic dissection in light of the CT scan results, the plaintiffs physical symptoms and the serious nature of the suspected condition. Consequently, we cannot say the jury was clearly wrong in its evaluation of the expert testimony or in concluding that Dr. Borders complied with the applicable standard of care in providing 112medical treatment to the plaintiff. Thus, the assignment of error lacks merit.
 

 CONCLUSION
 

 For the foregoing reasons, the trial court’s judgment is affirmed. The costs of this appeal are assessed to the appellant, Maria Lowrey.
 

 AFFIRMED.