GARRETT, J.
*138 In this medical malpractice case, the trial court granted summary judgment in favor of the defendant doctors. The plaintiffs appeal. Following our de novo review, we affirm.
FACTS
The medical records, depositions, and other documents submitted by the parties in connection with the motions for summary judgment and oppositions establish the following facts. In August 2012, Steven Richardson, a resident of Farmerville, Louisiana, and his wife were visiting their daughter, son-in-law, and their family in Shreveport, when he began experiencing severe low back pain. On August 7, 2012, he was taken by ambulance to the emergency room ("ER") at Christus Health Northern Louisiana/ Highland ("Christus Schumpert"), where he was seen by Dr. James W. Cotter, III. He complained of severe back pain over several days. He recounted that he had received a steroid injection two days earlier (which was administered by his son-in-law, Dr. Vekovius, an eye doctor) and had been prescribed Lortab. His vital signs were normal, and he did not have any neurological deficits. In recounting his history, he denied having fever, chills or sweating.
Dr. Cotter, who is board certified in emergency medicine, ordered an MRI without contrast, as well as lab work for chemistries and complete blood count ("CBC"). The chemistries were normal and the CBC showed an elevated white blood cell count. Dr. Cotter attributed the elevated CBC to the recent steroid injection. Dr. Mark Kraemer, a board-certified radiologist, interpreted the results of the initial MRI. He suggested that an MRI with contrast also be done. The subsequent MRI revealed an acute disc herniation at L5-S1, with mild to moderate central canal narrowing. Additionally, according to Dr. Kraemer's report, there was no evidence of discitis.[1] Dr. Cotter gave Richardson IV narcotics and steroids, and prescribed Valium for his muscle spasms. He further advised him to rest, to continue with the Lortab for pain, and to follow up with an orthopedic doctor.
On August 9, 2012, Richardson was seen at the Highland Clinic in Shreveport by Dr. Carl Goodman, a board-certified orthopedic surgeon. He complained of low back pain. After examining Richardson and reviewing the recent MRI from Christus Schumpert, Dr. Goodman felt he had an acute lumbar strain and sprain with no *139 signs of nerve root irritation or compression. The exam indicated back pain, but no neurological deficits. His stretch signs and straight leg raise were negative. According to Richardson, the onset of pain occurred four days before, while visiting his children and sleeping on a couch, and his son-in-law had given him a shot of Kenalog, a steroid. He stated that he felt better since the ER visit. He did not report any chills, fever or night sweats. After administering an injection of Celestone and Lidocaine in Richardson's low back, the doctor advised him to continue his medications and gradually increase his activities.
The Richardsons returned to their home at some point. Richardson was next seen by a nurse practitioner, who referred him to a pain medicine doctor. On August 21, 2012, Richardson was seen by Dr. James Hardy Gordon, a physician board certified in pain medicine and anesthesiology, at Louisiana Pain Care in Monroe. At this time, in addition to severe low back pain, he reported night sweats and fever of up to 102 degrees over the previous week. However, he did not have an elevated fever at the appointment. His exam showed very limited range of motion secondary to pain, tenderness in the lumbar spine, and a positive straight leg test. His blood work results were consistent with infection, and he was admitted to St. Francis Medical Center in Monroe.[2] A subsequent MRI revealed discitis and osteomyelitis at L5-S1, for which he was given IV antibiotics. In February 2013, Richardson underwent aortic valve replacement and bypass surgery at a Texas hospital. He contends that the heart surgery was necessitated by damage to his heart caused by the infection.
Richardson filed a medical malpractice complaint against both Dr. Cotter and Dr. Goodman, and their respective facilities, alleging that they all failed to diagnose his discitis. In February 2016, a medical review panel ("MRP") rendered a unanimous opinion finding that the evidence did not support the conclusion that any provider failed to meet the applicable standards of care. As to Dr. Cotter, it found that he performed a thorough exam, ordered the necessary tests that were indicated, and made arrangements for the patient to see an orthopedist. Based upon the history provided by the patient, the exam findings, and the results of the MRI and lab work, it concluded that further diagnostic testing, labs, or other evaluations were not warranted at that time. As to Dr. Goodman, the panel found that he took the patient's history, examined him, and reviewed the MRI done two days before. The neurological exam was normal, and no night sweats or fever were reported by the patient. The panel determined that the injection Dr. Goodman administered was not contraindicated under the circumstances, and, under these facts, the standard of care did not require him to order another MRI or additional blood work. Finally, the panel found that no evidence suggested that the nursing or other staff of either facility failed to provide appropriate care to Richardson.
Richardson and his wife filed the instant suit against the two doctors and the two facilities. They asserted that the defendants improperly assessed Richardson's condition, deviated from the appropriate standard of care, and failed to provide medical care consistent with the appropriate standards. They contended that the defendants' failures led to Richardson's *140 subsequent medical problems and the heart surgery.
Dr. Goodman and Highland Clinic filed a motion for summary judgment, in which they asserted that the plaintiffs had no competent expert witness to testify that their treatment of Richardson was below the applicable standard of care or caused any harm to the plaintiffs. In support of the motion, they attached copies of the MRP opinion and Dr. Goodman's statement to the MRP, in which he recounted the details of his treatment of Richardson. Dr. Cotter filed a similar motion for summary judgment. He likewise supported his motion with a copy of the MRP opinion and a list of undisputed material facts.
The plaintiffs filed an opposition to the motions. They submitted a list of what they contended were disputed facts, Richardson's medical records, the depositions of Dr. Gordon, Dr. Cotter, Dr. Goodman, and Dr. Kraemer, and an excerpt from Richardson's deposition. They contended that Dr. Gordon, the pain management doctor who treated Richardson in late August 2012, was competent to establish the relevant standard of care.
Dr. Gordon's deposition is of particular interest. After he described his treatment of Richardson, including ordering the CRP and sed rate tests, he was asked by plaintiffs' counsel if his treatment was "in accordance with your understanding of the standard of care for a patient presenting with those symptoms." He responded:
A For me, you know, I hope that that would qualify as standard of care. I mean, that's what I try to give my patients. You know, I obviously was not there when he went to the ER and, you know, if I had to-
Q And I'm not asking you to pass upon-
A Okay.
Q -the propriety of what someone else did. I'm just asking-
A Oh.
Q -you, in your opinion, was this the standard-
A Yeah. No. I mean, for me, yes. I mean, the standard of care I think for-in the position that I was in was what I did.
During questioning by counsel for Christus Schumpert, Dr. Gordon admitted that he was board certified in the fields of pain medicine and anesthesiology, but not in emergency medicine. This colloquy followed:
Q You don't follow patients in an emergency room setting in terms of seeing every-all the people that walk in off the street with various ailments and so forth. Right?
A No, I don't.
Q And your practice here in Monroe has been limited to pain management?
A Correct.
Q So you're not familiar with the standard of care that would be applicable to an emergency medicine specialist, are you?
A No.
Q And would the same be true of the nursing staff in the emergency room? You're not really familiar with the standard of care applicable to nurses who practice in an emergency department setting?
A No.
Q So that's correct. Right? You're not familiar with that standard of care?
A I mean, only from what I gathered in med school and whatnot. But, I mean, no, I'm not an ER physician and I do not practice in the ER setting and I am not-I mean, I'm familiar with the standard of care in *141 regards to what I do in my pain management practice, but I'm not going to sit here and say that I have-I know all the standard of care in the emergency department.
Additionally, he stated without reservation that it was not his intention to give any opinions adverse to Dr. Goodman. Furthermore, while questioning Dr. Gordon, plaintiffs' counsel specifically stated twice that he was not asking Dr. Gordon to pass or rule upon "the propriety" of someone else's conduct.
It is apparent from the transcript of the hearing on the motions for summary judgment that the trial court had carefully reviewed the deposition of Dr. Gordon relied upon by the plaintiffs to counter the defendants' arguments. The trial court quoted extensively from Dr. Gordon's deposition. Based upon Dr. Gordon's very candid deposition statements, quoted in part, supra , the trial court reasoned that he was not qualified to give expert testimony on the standard of care for an emergency medicine specialist or an orthopedic surgeon. The trial court gave the plaintiffs an additional 60 days to name an expert witness in emergency medicine and orthopedic surgery. No objection to this ruling was lodged by the plaintiffs. The trial court signed an order in which it granted Highland Clinic's motion for summary judgment, dismissing the plaintiffs' claims against it with prejudice at the plaintiffs' cost. The order, which was approved as to form and content by all counsel, then confirmed the 60-day period given to the plaintiffs to identify an expert witness qualified to offer testimony as to the standard of care in emergency room medicine and/or orthopedic medicine. It further stated that, in the event no expert witness was identified, the motions of Dr. Cotter and Dr. Goodman would be granted at the plaintiffs' cost without the necessity of any further court appearance.
In the meantime, Christus Schumpert filed its own motion for summary judgment, which was not opposed by the plaintiffs and was granted. At this juncture, only the two doctors remained as defendants.
Dr. Cotter and Dr. Goodman eventually filed ex parte motions requesting that their motions for summary judgment be granted because the plaintiffs had not identified any new expert witnesses. The plaintiffs filed an opposition, again claiming that Dr. Gordon's deposition testimony, combined with the factual evidence, was sufficient to establish the standard of care so as to preclude summary judgment. A hearing was held at which the plaintiffs' counsel reiterated that argument and also stated that his clients had elected not to incur the expense of obtaining additional experts. The trial court then signed a judgment granting the summary judgments in favor of Dr. Cotter and Dr. Goodman, dismissing the claims against them with prejudice at the plaintiffs' cost.
On appeal, the plaintiffs present the following assignment of error:
The court below erred in failing to accept the testimony of Dr. J. Hardy Gordon as establishing the standard of care to which Mr. Richardson was entitled and accepting that evidence as presenting genuine issues of material fact, precluding summary judgment in this case.
LAW
Summary Judgment
Appellate courts review summary judgments de novo under the same criteria that govern a district court's consideration of whether summary judgment is appropriate.
*142 Larson v. XYZ Ins. Co. , 2016-0745 (La. 5/3/17), 226 So.3d 412, 2017 WL 1709852 ; Greemon v. City of Bossier City , 2010-2828 (La. 7/1/11), 65 So.3d 1263.
Summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of actions. La. C.C.P. art. 966(A)(2). A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Dunn v. City of Kenner , 2015-1175 (La. 1/27/16), 187 So.3d 404 ; Samaha v. Rau , 2007-1726 (La. 2/26/08), 977 So.2d 880. After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3). The only documents that may be filed in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions. La. C.C.P. art. 966(A)(4).
The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. C.C.P. art. 966(D)(1).
When a motion for summary judgment is made and supported as provided in La. C.C.P. art. 967, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in La. C.C.P. art. 967, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. Larson v. XYZ Ins. Co. , supra .
Medical Malpractice
In pertinent part, La. R.S. 9:2794 states:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred. [Emphasis added.]
In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence: (1) that the doctor's treatment fell below the standard *143 of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. Fusilier v. Dauterive , 2000-0151 (La. 7/14/00), 764 So.2d 74.
A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence, and judgment. Hastings v. Baton Rouge General Hosp. , 498 So.2d 713 (La. 1986) ; Fusilier v. Dauterive , supra . A physician is not required to exercise the highest degree of care possible. Rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. Gordon v. Louisiana State Univ. Bd. of Sup'rs , 27,966 (La. App. 2 Cir. 3/1/96), 669 So.2d 736, writ denied , 96-1038 (La. 5/31/96), 674 So.2d 263.
Expert testimony is generally required to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony. Samaha v. Rau , supra ; Foster v. Patwardhan , 48,575 (La. App. 2 Cir. 1/22/14), 132 So.3d 495, writ denied , 2014-0614 (La. 4/25/14), 138 So.3d 1233. Because of the complex medical and factual issues involved in medical malpractice cases, a plaintiff will likely fail to sustain his or her burden of proving his or her claim under La. R.S. 9:2794 without medical experts. Schultz v. Guoth , 2010-0343 (La. 1/19/11), 57 So.3d 1002 ; Pfiffner v. Correa , 94-0924, 94-0963, 94-0992 (La. 10/17/94), 643 So.2d 1228 ; Lewis v. Tulane Univ. Hosp. & Clinic , 2003-0184 (La. App. 4 Cir. 8/27/03), 855 So.2d 383, writ not cons. , 2003-3253 (La. 12/19/03), 861 So.2d 576. Examples of an "obviously careless act" not requiring expert testimony include "fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body." Pfiffner v. Correa , supra .
Opinions of expert witnesses from the relevant medical professions are ordinarily necessary to determine the standard of care and whether the defendant breached the standard of care. See Med. Review Panel for Claim of Murphy v. Bernice Cmty. Rehab. Hosp. , 40,333 (La. App. 2 Cir. 10/26/05), 915 So.2d 354, writ denied , 2005-2399 (La. 3/17/06), 925 So.2d 549. In a medical malpractice action, opinions of expert witnesses who are members of the medical profession and who are qualified to testify on the subject are necessary to determine whether or not physicians possessed the requisite degree of knowledge or skill, or failed to exercise reasonable care and diligence. Richardson ex rel. Brown v. Lagniappe Hosp. Corp. , 33,378 (La. App. 2 Cir. 5/15/00), 764 So.2d 1094, on reh'g in part , 33,378 (La. App. 2 Cir. 6/21/00), 801 So.2d 386. Physicians' actions are not to be evaluated on the basis of hindsight or in light of subsequent events. Med. Review Panel for Claim of Murphy v. Bernice Cmty. Rehab. Hosp. , supra .
Where medical disciplines overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines. Battaglia v. Chalmette Med. Ctr., Inc. , 2012-0339 (La. App. 4 Cir. 10/17/12), 126 So.3d 524. A specialist's knowledge of the requisite subject matter, rather than the specialty or subspecialty within which the specialist practices, determines whether a specialist may testify as to the degree of care which should be exercised. A particular specialist's knowledge *144 of the subject matter on which he is to offer expert testimony should be determined on a case by case basis. Harper v. Minor , 46,871 (La. App. 2 Cir. 2/1/12), 86 So.3d 690, writ denied , 2012-0524 (La. 4/27/12), 86 So.3d 629, and writ denied , 2012-0528 (La. 4/27/12), 86 So.3d 632.
DISCUSSION
In seeking summary judgment, Dr. Cotter and Dr. Goodman relied upon the unanimous MRP opinion to establish that they did not breach their applicable standards of care. Once the defendant doctors satisfied their burden of proving a prima facie case, the burden shifted to the plaintiffs to show genuine issues of material fact. It was incumbent upon the plaintiffs to produce an expert witness whose testimony established the standards of care applicable to the defendant doctors, breaches of those standards by the defendant doctors, and causation linking the breaches to the patient's injury. In this case, we agree with the analysis by the trial court that the deposition testimony of Dr. Gordon failed to establish any of these matters.
In an effort to obtain a reversal of the summary judgments, the plaintiffs raise numerous arguments. They contend that expert testimony is not always needed to prove medical malpractice. While this may be true in some rare instances, it is simply not applicable in the case before us. The information in this record outlined above establishes the complexities of diagnosing discitis -which appears to be a rare condition, according to Dr. Goodman's unrefuted testimony. It cannot be said that the alleged negligence in this case is so obvious that a lay person can infer negligence without the guidance of expert testimony. Further, the plaintiffs' reliance on this argument is somewhat belied by the fact that they have relied upon Dr. Gordon both below and on appeal to try to establish the standard of care.
The plaintiffs also contend that Dr. Gordon "clearly articulated the standard of care for diagnosis and treatment of discitis."[3] They assert in their brief that detection of an infectious process is not a medical specialty but is so fundamental that any "first-year medical student should surely know this." However, there is simply no evidence in this record to support these contentions or to establish that there is an "overlap" of the specialties of emergency medicine, orthopedic surgery, and pain medicine as to discitis.
Careful review of Dr. Gordon's deposition reveals that his testimony as to the standard of care lacked clarity and was woefully inadequate to establish the relevant standards of care in the instant case. At best, he testified as to the measures he took on behalf of the patient. He then expressed first his hope that what he did would qualify as the standard of care. He next stated that he thought that what he did would constitute the standard of care for a physician "in the position that I was in." Dr. Gordon further qualified his testimony by candidly admitting that he was not there when Richardson presented in the emergency room, that he did not follow *145 patients in an emergency room setting, and that he was not familiar with the standard of care applicable to an emergency medicine specialist such as Dr. Cotter. With equal candor, Dr. Gordon stated in his deposition that he was not asked to give any opinions adverse to Dr. Goodman and that it was not his intention to do so.
The plaintiffs incorrectly assert that Richardson had the same symptoms when he was seen by all three doctors. The record does not support this contention. Dr. Gordon's deposition testimony clearly established that Richardson presented to him with much different symptoms (notably, a positive straight leg raise and a history of fever and night sweats during the previous week) than those encountered by Dr. Cotter and Dr. Goodman when they saw the patient earlier in the month. Dr. Gordon candidly testified that he too would have interpreted Dr. Kraemer's MRI report as stating that there did not appear to be any evidence of discitis at that particular point in time. As Dr. Gordon readily conceded, he had "the luxury" of seeing Richardson "a couple of weeks" after the other doctors. These differing symptoms were highly relevant factors in Dr. Gordon's treatment of Richardson at that later date.
To the extent that the plaintiffs appear to argue that any doctor in any field should have diagnosed Richardson by running the same battery of tests as Dr. Gordon, this argument is flawed under the facts of this case. As previously noted, Richardson's manifestation of symptoms changed significantly over the time period between when Dr. Cotter and Dr. Goodman saw him and when he presented to Dr. Gordon. The depositions amply demonstrate that the different fields involved here obviously have different standards.
Based upon our de novo review, we find there are no genuine issues of material fact and that the defendant doctors were entitled to summary judgment as a matter of law. The plaintiffs have failed to come forward with the evidence necessary to satisfy their burden of proof under La. R.S. 9:2794. Accordingly, we affirm the trial court ruling granting summary judgment in favor of Dr. Cotter and Dr. Goodman.
CONCLUSION
The trial court ruling granting summary judgment in favor of the defendants, Dr. James W. Cotter, III, and Dr. Carl Goodman, is affirmed.
Costs of this appeal are assessed against the plaintiffs, Steve Richardson and Gwen Richardson.
AFFIRMED.

Discitis (or diskitis ) is an inflammation or infection that develops between the intervertebral discs of the spine.
According to Dr. Cotter's deposition testimony, an MRI with contrast is "the gold standard to diagnose discitis in the emergency department." A patient who is diagnosed with discitis is given IV antibiotics and admitted to the hospital. Dr. Carl Goodman testified in his deposition that he had seen only about five cases of discitis in his 46 years of practice, and that discitis presents with pain "so severe that the patient is hysterical." According to his testimony, untreated discitis can result in sepsis. He further stated that all of his discitis diagnoses were made with a positive MRI result.
Dr. Kraemer's MRI report stated that the precontrast images raised "the possibility of diskitis." As a result, the postcontrast images were also ordered by Dr. Cotter and performed by Dr. Kraemer. After reviewing these images, Dr. Kraemer concluded in his report that "there does not appear to be evidence of diskitis." Dr. Kraemer noted in his report and in his deposition that he discussed his findings with both Dr. Cotter and Dr. Vekovius.

Two of the tests ordered by Dr. Gordon, C-reactive protein ("CRP") and sed rate, were nonspecific indicators of inflammation and showed significantly elevated results for Richardson. In his deposition, Dr. Cotter stated that these were not standard emergency tests, noting the long period of time it took to obtain their results.

In support of their argument that Dr. Gordon was competent to establish the standard of care, the plaintiffs quote the following portion of La. R.S. 9:2794(B) : "Any party to an action shall have the right to subpoena any physician ... for a deposition or testimony for trial, or both, to establish the degree of knowledge or skill possessed or degree of care ordinarily exercised as described in Subsection A of this Section." The plaintiffs omitted the remaining relevant portion of this statute which requires that the physician "has or possesses special knowledge or experience in the specific medical procedure or process that forms the basis of the action."