Judgment rendered January 25, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,813-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

THOMAS D. FRYE, ET UX.                    Plaintiffs-Appellants

versus

RICHARD INGRAM BALLARD,                   Defendant-Appellee
M.D.

* * * * *

Appealed from the
Third Judicial District Court for the
Parish of Lincoln, Louisiana
Trial Court No. 59342

Honorable Thomas Wynn Rogers, Judge

* * * * *

NELSON & HAMMONS, APLC              Counsel for Appellants
By:  John Layne Hammons
     Cornell Rushing Flournoy
     Robert Clayton Christian


HUDSON, POTTS, & BERNSTEIN, LLP     Counsel for Appellee
By:  Gordon L. James
     Sara G. White
     Jason Richard Smith


* * * * *

Before PITMAN, THOMPSON, and HUNTER, JJ.

THOMPSON, J., dissents with written reasons.

**HUNTER, J.**

Plaintiff, Thomas D. Frye, filed a medical malpractice lawsuit against defendant, Richard Ingram Ballard, M.D. Mr. Frye's wife, Sharon Frye, asserted a claim for loss of consortium. Following a bench trial, the trial court rendered a judgment in favor of defendant, dismissing plaintiffs' claims with prejudice. For the following reasons, we affirm.

## FACTS

On September 8, 2014, plaintiff, Thomas Frye, a 73-year-old man, fell from a forklift and sustained a complex fracture of the right wrist. He was transported to the emergency room at Northern Louisiana Medical Center in Ruston, Louisiana. The emergency room staff called defendant, Richard Ingram Ballard, M.D., the on-call orthopedic surgeon. Dr. Ballard examined Mr. Frye in the emergency room and reviewed the x-rays. Later that day, Dr. Ballard performed surgery on Mr. Frye, repairing the fracture by inserting an external fixation device through the skin into the bone to stabilize the fracture and maintain proper alignment of the bone.

Mr. Frye's first post-operative visit was nine days after the surgery. During the visit, Dr. Ballard noted the insertion sites of the pins "looked good," and he instructed Mr. Frye to continue his wound care regimen. Mr. Frye's next appointment with Dr. Ballard was on October 7, 2014. During the visit, the x-ray did not show any soft tissue abnormality. However, the physical examination revealed Mr. Frye was exhibiting symptoms of an infection (swelling, pain, and drainage) around the device. Dr. Ballard prescribed Keflex, a broad-spectrum antibiotic, and arranged for Mr. Frye to begin occupational therapy, which encompassed whirlpool treatments and wound care. Mr. Frye's symptoms persisted. Approximately one week

later, on October 13, 2014, Dr. Ballard noted "quite a bit of swelling" in Mr. Frye's wrist. He prescribed Bactrim, another broad-spectrum antibiotic, and continued occupational therapy. Dr. Ballard did not order any additional radiological studies at the time.

On October 27, 2014, Mr. Frye returned for a follow-up visit. He reported swelling in his third finger, bruising on his upper arm, and difficulty lifting his arm. Dr. Ballard noted the presence of "cellulitis of the hand due to some lack of care for his fixator." He removed the external fixation device and noted a plan to "begin vigorous therapy" to decrease the swelling.

On November 10, 2014, Mr. Frye presented to Dr. Ballard with complaints of "sharp, throbbing pains," redness, and swelling in his wrist. During a physical examination, Dr. Ballard noted Mr. Frye continued to experience pain and redness, but the swelling and drainage had improved.

Mr. Frye underwent occupational therapy at Green Clinic to improve his mobility and to treat his wounds. The occupational therapy notes detailed the appearance and function of Mr. Frye's hand, wrist, and arm from the date he began therapy, October 7, 2014, until his last date of treatment, December 30, 2014. According to the notes, Mr. Frye presented to occupational therapy on October 7, 2014, with "significant swelling" in his arm and "significant yellow exudate" with a foul odor "oozing from pins." On October 13, 2014, Mr. Frye arrived at therapy with a "severely swollen arm and hand," and "MD saw [patient] today and decided to change antibiotics." Thereafter, the notes detailed Mr. Frye's treatment and his response thereto. Although Mr. Frye experienced bouts of swelling in the hand and wrist, the medical records indicate an overall improvement in the

2

appearance and function of his hand and wrist. On November 25, 2014, the therapist noted, "Marked decrease in [right] hand swelling" and "Dr. Ballard saw [patient] today and was very pleased."

Through the remainder of November and the first half of December, Mr. Frye reported improvement in mobility, strength, and function of his hand and wrist, and he did not report any pain. On December 16, 2014, Mr. Frye presented to occupational therapy complaining of pain in his right wrist. The therapist further noted his participation in therapy was limited by his pain. Two days later, Mr. Frye returned to occupational therapy complaining of severe pain, and his hand was "visibly swollen." According to the therapy notes, Mr. Frye was "encouraged to make another appointment with [Dr. Ballard]." Mr. Frye returned to therapy on December 30, 2014, and he reported is condition was "about the same." The therapist noted:

> Pt. came to therapy wearing light edema glove on his R hand. He said he has made an appointment with a hand specialist in Shreveport because he still has severe pain with wrist extension and supination. Pt's hand was visibly edematous; however, the tissue was soft and pliable. Pt. participated in extremity pump to decrease edema in the R hand.
> ***
> Pt has made some progress with R hand [active range of motion] and edema control over time; however, no significant changes have been noted in past few weeks. *** We will continue to see pt. once a week until pt. sees specialist in order to monitor edema and ensure [active range of motion] increases in wrist and digits.
> ***

Mr. Frye never returned to Dr. Ballard's office, and the December 30, 2014, occupational therapy appointment was Mr. Frye's last appointment at Green Clinic. During his deposition, Mr. Frye testified he decided to seek a second opinion because he continued to experience pain, and he "just knew

3

that something wasn't right inside of my arm and it'd swell up, go down, swell up, go down." He stated he spoke to a friend, who is a registered nurse, and she suggested he make an appointment with Dr. Marion Milstead, an orthopedic hand specialist in Shreveport.

Mr. Frye was examined by Dr. Milstead on January 6, 2015. Mr. Frye presented with complaints of "severe pain, stiffness, and difficulty using the right hand." The physical examination revealed "tremendous amount of swelling of the entire right hand," from above Mr. Frye's wrist to the end of his fingers. Dr. Milstead also noted "the entire hand feels warm to touch with increased pain with any palpation over the radiocarpal joint." Dr. Milstead ordered an x-ray, a triple bone scan, and an indium white cell count test. After reviewing the x-rays, Dr. Milstead noted:

> The x-rays that were done today do show an old healed fracture at the distal radius with collapse of the ulnar half of the articular surface but with it healed. Also shows significant collapse of all the entire proximal row, severe osteoporosis of all the carpal bones, and significant sclerosis of the entire proximal half of the capitate.
>
> PLAN: I have discussed with him that these x-ray changes look like it is possible osteomyelitis that could explain the resolution or absorption of the carpal bones that is occurring. In an effort to try to prove whether or not this is just old crush injury with diffuse osteoporosis versus osteomyelitis, we will go ahead and put him in a wrist forearm splint to immobilize the wrist, continue doing the therapy they are doing *** and we will set him up to have first a standard bone scan, and once that is completed, then follow that with an indium white cell scan[.]

Further, Mr. Frye underwent an MRI on February 1, 2015. The radiology report provided, in part:

> Examination reveals evidence of comminuted fracture involving distal radius and styloid process of ulna. There is evidence of marked irregularity and erosive changes involving the carpal and proximal metacarpal bones. Erosive changes involving distal radius also seen.
> ***

4

IMPRESSION:
1. Abnormal carpal bones and some proximal metacarpal bones. Abnormal signal intensity of bone marrow associated with irregularity of bony cortex noted. Infiltration of fat plane is also seen. Possibility of septic arthritis cannot be ruled out. \*\*\*
2. Evidence of comminuted fracture involving distal radius and styloid process of ulna. Acquired positive ulnar variance is noted.
3. Tendinosis of extensor carpi ulnaris.

The bone scan revealed "Osteonecrosis of basically all carpal bones particularly the proximal carpal row from previous trauma[.]"

On January 20, 2015, Dr. Milstead prepared a progress report, which stated Mr. Frye's bone scan and white cell scan were "positive for probable osteomyelitis involving all the carpal bones." Dr. Milstead referred Mr. Frye to Dr. Halim Abou-Faycal, an infectious disease specialist. Thereafter, Mr. Frye was admitted to Promise Hospital to undergo treatment with intravenous broad-spectrum antibiotics for approximately six weeks.

Plaintiffs instituted a medical malpractice action against Dr. Ballard. Plaintiffs asserted Dr. Ballard breached the standard of care for an orthopedic surgeon because he failed to timely diagnose and treat Mr. Frye's bone infection. Plaintiffs also alleged Dr. Ballard's failure to diagnose and treat Mr. Frye's infection caused it to progress into osteomyelitis, which resulted in the destruction of the carpal bones in his hand.

On November 27, 2017, the medical review panel ("MRP") unanimously concluded Dr. Ballard "failed to meet the applicable standard of care as charged in the complaint [and] [t]he conduct complained of was a factor in the alleged resultant damages." In its written reasons for its conclusion, the MRP stated:

Our review of the care provided to this patient by Dr. Ballard postoperatively is troublesome. Although Mr. Frye was

5

instructed to follow wound care instructions concerning the placement of pins with the external fixator, it is well known that the risk of infection is increased. The medical records are clear in that this patient did develop redness, swelling, and pus at or near the pin sites. This was found by both Dr. Ballard and the therapists at the PT/OT unit. This was also made known by the patient to these health care providers and specifically, Dr. Ballard.

Dr. Ballard did order a prescription for Keflex, which is a broad spectrum antibiotic that was apparently taken by Mr. Frye. However, Mr. Frye continued to have symptoms even after this antibiotic was prescribed as well as another medication. In spite of these developments, Dr. Ballard did not order any follow-up x-rays of the hand with the exception of October 7, 2014. Moreover, no x-rays were ordered at the time that the external fixator was removed along with the pins. We believe that intermittent x-rays should have been ordered and taken at the time of the removal of the external fixator and pins. This not only would have provided evidence of proper alignment and healing, but may have well provided Dr. Ballard with evidence that some infectious process was underway. Additionally, the patient related to Dr. Ballard or to the therapist that he had developed a pus pustule and that he had obtained relief from the pain when this pustule had spontaneously burst.[1]

We believe that there was ample medical evidence available to Dr. Ballard to raise a high level of suspicion that an infectious process was progressing.

\*\*\*

We think the care and management provided to Mr. Frye by Dr. Ballard was a deviation from the accepted standard of care for an orthopedic surgeon. This care and management by Dr. Ballard was [sic] a factor in the alleged resultant damages in that the patient's recovery time was slowed and complicated by the development of this unaddressed infectious process.

\*\*\*

---

[1]On October 20, 2014, the occupational therapist noted Mr. Frye had reported the "base of [his] thumb popped open, and puss [sic] and blood ran out of it[.]" The therapist also noted the presence of drainage from a "small hole in between pin sites," an improvement in skin coloration and redness, and a significant decrease in the amount of swelling. According to the notes, Dr. Ballard "was informed about opening in palm, and he refilled [Mr. Frye's] prescriptions."

6

After obtaining the favorable MRP opinion, plaintiffs filed a medical malpractice lawsuit on December 14, 2017. Mr. Frye's wife asserted a claim of loss of consortium.

A bench trial was held June 2-3, 2021.[2] There was no live testimony presented at trial. However, Mr. Frye's medical records, medical bills, and the MRP opinion and written reasons were introduced into evidence. The video depositions of Mr. Frye, Mrs. Frye, Drs. Ballard, Milstead, Houtz, Ritter, Morris, and Blair were admitted into evidence and played in open court. The deposition of Dr. Abou-Faycal was read in open court.

After reviewing the evidence present, the trial court entered a judgment in favor of Dr. Ballard and dismissed plaintiffs' claims. In its lengthy reasons for judgment, the trial court stated, in pertinent part:

*** 

Based on Dr. Milstead's testimony, the report of the Medical Review Panel and the testimony of 2 of the 3 doctors on the panel, Dr. Ballard's breach of the standard of care centers around his failure to have Mr. Frye's hand and wrist x-rayed more than the one time it was x-rayed postoperative[ly] on October 7, 2014. However, no one specified a specific frequency such as once a week. ***

The secondary reason for an X-ray would be to monitor for other issues such as an infection. When physical examinations of Mr. Frye on October 7, 2014, revealed signs of a possible infection, Dr. Ballard prescribed Keflex, a broad spectrum antibiotic. When the infection persisted, Dr. Ballard changed from Keflex to Bactrim, another broad spectrum antibiotic, which resulted in intermittent improvements from October 15, 2014, through November 10, 2014, when noticeable improvement was noted. No signs of infection are noted throughout except for swelling which required drainage from time to time. This was sometimes attributed to Mr. Frye's exercise at home.

*** 

---

[2] Initially, Dr. Ballard requested a jury trial; however, he later withdrew the request. On February 20, 2020, plaintiffs filed a motion for a jury trial and paid the appropriate bond. The trial court granted the motion. Thereafter, plaintiffs filed a motion to waive the request for a jury trial and requested a bench trial.

Since Mr. Frye never went back to Dr. Ballard, we can never know what treatment he would have prescribed or what tests he would have ordered after December 18, 20[14]. According Dr. Morris, the October 7, 2014, X-ray showed nothing significant. According to Dr. Milstead, the X-ray of January 6, 2015, showed osteomyelitis which would have been caused by the infection which Dr. Ballard failed to adequately treat. However, Dr. Morris and Dr. Blair disagreed with this assessment. Dr. Milstead also ordered 2 additional tests, a triple-phase bone scan and an indium white cell scan, both of which he claims showed vague positive activity in the right wrist. He said this was also indicative of an infection which would confirm osteomyelitis. Here again, both Dr. Morris and Dr. Blair dispute this finding.

The question was never asked whether X-rays and tests taken between October 7 and December 18, 2014, would have shown anything that would have alarmed either Dr. Ballard or Dr. Milstead. If Dr. Morris and Dr. Blair didn't see any clear evidence of osteomyelitis from the X-rays and tests of January 6, 2015, its [sic] even less likely that they would have seen them on an earlier date.

Dr. Milstead testified that the proper treatment for an infection would be to start with a broad spectrum antibiotic and monitor the results. This is exactly what Dr. Ballard did. Dr. Milstead would have followed up [on] this 3-4 days later. Dr. Ballard waited a longer period. Dr. Milstead testified that if the infection failed to respond the first antibiotic, he would then prescribe a different broad spectrum and monitor its effectiveness. This is also what Dr. Ballard did, but on a longer time frame. Dr. Milstead would have also ordered X-rays to monitor the progress, which Dr. Ballard did not.

\*\*\*

The court will never know what X-rays between October 7, 2014 and January 6, 2015 would have shown. It is only logical to assume that evidence of osteomyelitis would have been less evident the closer you go back to October 7, 2014. Dr. Morris said that on October 7, there was nothing significant. If a highly qualified radiologist saw nothing significant to indicate osteomyelitis on January 6, it is even more unlikely he would have seen it earlier.

The way in which Mr. Frye's recovery waxed and waned over the course of his post-operative care under Dr. Ballard is disconcerting. Progress followed by regression followed by regression. However, Mr. Frye's injury was a serious fracture requiring an external fixator pin, which undoubtedly slowed the healing process, complicated therapy, and increased the likelihood of infection. Mr. Frye was 7[3] years old, a smoker and his wrist and hand showed signs of osteopenia or thinning

of the bones due to loss of bone mineral density on the date of the surgery.

\*\*\*

[T]he court finds Mr. and Mrs. Frye have not shown by a preponderance of the evidence that Dr. Ballard breached the standard of care. Dr. Ballard's approach to Mr. Frye's post-operative care impressed the court as both logical and reasonable. Taking into consideration Mr. Frye's age, health, attitude and the serious nature of his injury, the intermittent progress of his recovery was not surprising. Up until December 16, 2014, the court can find no fault in what Dr. Ballard did. Thereafter, he was never given a chance to respond to the sudden change in Mr. Frye's condition.

\*\*\*

Plaintiffs appeal.

## DISCUSSION

Plaintiffs contend the trial court erred in failing to consider the "judicial confessions" contained in Dr. Ballard's deposition testimony. Plaintiffs also assert the record shows Dr. Ballard failed to diagnose and treat Mr. Frye's infection and resulting osteomyelitis, and the trial court erred in concluding they failed to meet their burden of proving Dr. Ballard breached the applicable standard of care. Further, plaintiffs argue three medical experts testified Mr. Frye developed osteomyelitis, which led to the destruction of the bones in his hand, and the trial court erred in failing to give greater weight to his treating physician, Dr. Milstead. Additionally, plaintiffs maintain the trial court erred in failing to award damages for the prolonged pain and suffering he endured. He argues he introduced into evidence proof of his medical expenses, which totaled $183,296.10, the evidence established he has lost at least 50% function in his hand and wrist as a result of the destruction of the bones, and he should have been awarded general damages in the amount of $750,000, in addition to damages for lost earnings, lost earning capacity, and past and future medical expenses.

9

La. R.S. 9:2794(A) provides the plaintiff has the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians *** licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians *** within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

The plaintiff has the burden of proving, by a preponderance of the evidence, (1) the doctor's treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. *Fusilier v. Dauterive*, 00-0151 (La. 7/14/00), 764 So. 2d 74, *citing Gordon v. Louisiana State Univ. Bd. of Sup'rs*, 27,966 (La. App. 2 Cir. 3/1/96), 669 So. 2d 736, *writ denied*, 96-1038 (La. 5/31/96), 674 So. 2d 263; *Powell v. Merriman*, 53,757 (La. App. 2 Cir. 3/3/21), 314 So. 3d 1097.

A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence, and judgment. *Hastings v. Baton Rouge Gen. Hosp.*, 498 So. 2d 713 (La. 1986); *Powell*, *supra*. A physician is not required to exercise the highest degree of care possible; rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. *Gordon*, *supra*; *Powell*, *supra*. The law does not require absolute precision from a physician. *Id*. The mere fact that an

10

injury occurred does not raise a presumption that the physician was negligent.  *Powell*, *supra*; *Hays v. Christus Schumpert N. Louisiana*, 46,408 (La. App. 2 Cir. 9/21/11), 72 So. 3d 955.

Appellate review of a trial court's findings in a medical malpractice action is limited to manifest error.  *Johnson v. Morehouse Gen. Hosp.*, 10-0387 (La. 5/10/11), 63 So. 3d 87; *Lewis on Behalf of Lewis v. Cornerstone Hosp. of Bossier City, LLC*, 53,056 (La. App. 2 Cir. 9/25/19), 280 So. 3d 1262.  A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong.  *Powell*, *supra*; *Moore v. Smith*, 48,954 (La. App. 2 Cir. 5/21/14), 141 So. 3d 323, *citing Crockham v. Thompson*, 47,505 (La. App. 2 Cir. 11/14/12), 107 So. 3d 719.

Expert witnesses who are members of the medical profession are needed to establish the applicable standard of care, whether the standard of care was breached by the defendant doctor's conduct, and whether that breach resulted in injury to the plaintiff.  *Powell*, *supra*; *Richardson v. Cotter*, 51,637 (La. App. 2 Cir. 9/27/17), 245 So. 3d 136; *Jones v. Hernandez*, 38,818 (La. App. 2 Cir. 8/18/04), 880 So. 2d 245, *writ denied*, 04-2319 (La. 11/19/04), 888 So. 2d 203. Where there are conflicting expert opinions concerning the defendant's compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact.  *Powell*, *supra*; *Van Buren v. Minor*, 51,960 (La. App. 2 Cir. 4/11/18), 247 So. 3d 1040, *writ denied*, 18-0768 (La. 9/21/18), 252 So. 3d 911. The effect and weight to be given to expert testimony is within the broad discretion of the trial court.  *Powell*, *supra*; *Jones*, *supra*.

11

Expert witnesses often disagree on the applicable standard, and when two permissible views are presented to the judge or jury, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. *Montz v. Williams*, 16-145 (La. 4/8/16), 188 So. 3d 1050; *Rosell v. ESCO*, 549 So. 2d 840 (La. 1989). Likewise, where the fact finder's determination is based on its decision to credit the testimony of one of two or more witnesses, its finding can virtually never be manifestly erroneous. *Montz*, *supra*; *Bellard v. American Cent. Ins. Co.*, 07-1335 (La. 4/18/08), 980 So. 2d 654.

Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. *Roberts v. Cox*, 28,094 (La. App. 2 Cir. 2/28/96), 669 So. 2d 633; *Lowrey v. Borders*, 43,675 (La. App. 2 Cir. 12/10/08), 1 So. 3d 635.

In the instant case, to establish the standard of care applicable to orthopedic surgeons who provide post-operative care, and to prove Dr. Ballard's treatment fell below the standard of care expected of a physician in his medical specialty, plaintiffs presented the expert testimony of Drs. Milstead, Abou-Faycal, Houtz, and Ritter. Dr. Milstead testified Mr. Frye presented to him on January 6, 2015, exhibiting severe pain, redness, and swelling in his hand and wrist, and subsequent x-rays indicated the presence of a bone infection. Dr. Milstead also testified the infection had "chewed up" and "crushed" the bones in Mr. Frye's hand. Further, Dr. Milstead stated:

12

[O]steomyelitis can develop within six weeks, but to get to this kind of bone destruction \*\*\* to get eroded through cartilage, jump the joint in the next bone, jump the joint, get in the next bone, you're talking about at least two months for infection to get to this degree or severity.

Dr. Houtz, an orthopedist who served on the MRP, testified Dr. Ballard breached the applicable standard of care by failing to order x-rays when he removed Mr. Frye's external fixator device. He opined the x-rays could have shown the presence of an infection.

Dr. Ritter, an orthopedist who subspecializes in hand and wrist surgery, also served on the MRP. She testified the use of an external fixator increases the risk of an infection, and Dr. Ballard should have known Mr. Frye's symptoms indicated an active infection, even after treatment with the first round of antibiotics. Dr. Ritter stated Dr. Ballard should have ordered x-rays to adequately manage the circumstances. She further testified there was ample evidence to establish a "high level of suspicion" to alert Dr. Ballard of the presence of a persistent infection. According to Dr. Ritter, Dr. Ballard breached the standard of care by failing to order x-rays and the appropriate lab tests to determine the effectiveness of the antibiotics. She also opined Dr. Ballard should have performed an incision and drainage of the pin sites and obtained a bone biopsy.

Dr. Abou-Faycal, the infectious disease specialist who provided inpatient treatment for Mr. Frye's infection, testified. He stated the insertion of an external fixator carries a "higher degree of infection than other procedures," and the surgeon generally monitors the patient for signs of an infection. Dr. Abou-Faycal also testified Dr. Milstead consulted him because he suspected Mr. Frye had a bone infection. He further testified symptoms, such as severe swelling, pain, and inability to use the hand,

should have raised the suspicion of infection in a patient who has had an external fixator. Additionally, Dr. Abou-Faycal stated a hand which feels warm to touch, with increased pain with any palpitation over the radiocarpal joint, supports a differential diagnosis of an infection. Nevertheless, Dr. Abou-Faycal testified Mr. Frye's MRI, x-rays, and blood tests were "not very obvious for infection." He explained the test results could have indicated inflammation. Dr. Abou-Faycal stated after a six-week course of IV antibiotics, Mr. Frye was "cured of the infection," and he no longer experienced pain.

Dr. Ballard presented the testimony of Drs. Robert Morris and Major Blair. Dr. Morris, a radiologist with a subspecialty in musculoskeletal radiology, testified he had reviewed the radiological tests, reports, as well and the MRP opinion and the depositions of Drs. Milstead and Abou-Faycal. Dr. Morris testified the x-rays obtained when Mr. Frye initially injured his hand showed a severe fracture of the wrist, and the x-rays after the surgery revealed the external fixator with the pins in place. Dr. Morris also testified after reviewing the initial x-ray films, the radiologist noted Mr. Frye's bones were "osteopenic," which means there was a deficiency in the minerals of the bones due, in part, to immobilization of the bone from nonuse. He also stated the x-ray taken on October 7, 2014, the day the infection was initially diagnosed, was normal. With regard to the x-rays obtained at Dr. Milstead's office on January 6, 2015, Dr. Morris testified the tests revealed the fracture was healing, and the distal radius and carpal bones were more osteopenic. Dr. Morris stated he was unable to ascertain whether the changes in the bones of Mr. Frye's hand and wrist resulted from disuse or infection. He testified as follows:

14

[T]his is kind of a standard appearance for somebody who's had a pretty bad fracture after a long period of immobilization to have a lot of osteopenia like this. And so, no, there's nothing to indicate infection or any – anything like that.

Dr. Morris also testified the "three-phase" bone scan showed increased blood flow to the hand, which indicated the fracture was healing. He stated the changes shown on the bone scan could have been attributed to trauma, infection, osteoarthritis, inflammatory arthritis, or tumors.

Dr. Blair, a board-certified orthopedic surgeon, testified he reviewed Mr. Frye's hospital records, Dr. Ballard's office records, Dr. Milstead's records, Dr. Abou-Faycal's records, the records from Promise Hospital, the MRP opinion, and the depositions of Drs. Ballard and Morris. Dr. Blair testified Dr. Ballard performed the appropriate procedure, in the appropriate manner, to treat Mr. Frye's injury. He also stated Dr. Ballard prescribed the proper antibiotics when he detected Mr. Frye was exhibiting signs of an infection. With regard to Mr. Frye's condition and treatment through December 2014, Dr. Blair stated:

> The last time he saw Dr. Ballard was late in November, [on] about November 24th. Mr. Frye was doing well for a while and then after he had been referred to physical therapy, he was continuing to improve and then he started getting worse and he continued seeing – seeing the therapist.

> He last – he saw Dr. Ballard – I believe was the 10th of November and he got a return appointment for a couple of weeks scheduled. Dr. Ballard saw him at physical therapy[.] And from then, Dr. Ballard told him to come back and see him.

> He started getting worse, and I believe the therapist reported that he was worse on the *** 18th of December. And at that point, the therapist said, you need to get back to see Dr. Ballard, and Mr. Frye never did return to see Dr. Ballard.

Further, Dr. Blair testified Dr. Ballard's records indicated Mr. Frye "appeared to be getting better," and after completing the antibiotics, "his

wounds finally stopped draining." Dr. Blair disagreed with the opinion of the MRP, stating he "came to a complete[ly] different conclusion." Dr. Blair opined the x-rays obtained by Dr. Milstead did not clearly indicate Mr. Frye had osteomyelitis. He stated the changes on the x-rays could "happen from a lot of different things," such as reflex sympathetic dystrophy, complex regional pain syndrome, or neuropathic arthropathy. Dr. Blair further testified as follows:

> When Dr. Milstead did subsequent indium scans, white blood cell scans, the white blood cell scan really was pretty bland and very – barely mildly positive, which was not something that you would see in an osteomyelitis or some suspected septic arthritis. That area of the bone would be standing out like a beacon in the dark.
>
> The other things that really mitigated against a gross ongoing infection were the laboratory results at Promise Hospital. Mr. Frye, on admission, had some laboratory values drawn. He had a normal white count, which you would not expect to find in osteomyelitis or definitely not expect to find that in a septic arthritis. He had a normal C-reactive protein, which is basically a meter of inflammation, and his C-reactive protein, if anything, was low. The sed[imentation] rate was also very low and unnecessarily low for someone who would have supposedly some enormous infection.
> ***
> Sedimentation rate is a method of testing inflammation. ***
> And the sed rate in somebody with a great deal of inflammation is much, much higher. Someone with an infection is much, much higher than somebody who does not have a lot of infection, inflammation, or systemic arthritis going on.
> ***
> The MRI [is] used in evaluating injuries to determine the amount of inflammation and – and fluid, basically the amount of water or edema in the bones and joints.
>
> If you've got septic joint, it's quite dramatic how much fluid you have because there's a lot of pus laying around. In osteomyelitis, that process is distinctly different and you have a ton more edema in the bones involved. His MRI didn't really show a whole lot of edema in the carpal bones or in the distal radius or certainly in the area of the pin tracts.
> ***
> I think you can make a very mild case that there might have been a little bit, but there were a lot of other things that should

16

have been considered. And when you compare the bone scan, the indium scan, the x-rays and the MRI, you really don't have the picture of an osteomyelitis. You really have a very good picture. Given the bone scan, the x-rays and the lack of inflammation on the laboratory studies, you have a good picture of chronic regional pain syndrome.

\*\*\*

I just read the opinion of the [MRP], and they really had two things they were concerned about, one that Dr. Ballard didn't do x-rays when he took off the external fixator and later that he did not find infection or treat infection. \*\*\*

So, yes, they were critical that he did not treat or manage an infection in the wrist more aggressively, where I didn't really see that the wrist changes evidenced a septic arthritis or an osteomyelitis of the carpal bones.

\*\*\*

In the present case, the trial court was presented with competing expert opinions. Plaintiffs' witnesses testified Dr. Ballard breached the appropriate standard of care by failing to detect and adequately treat Mr. Frye's infection, which caused the infection to spread to the bones of his wrist. Conversely, defense experts testified Mr. Frye's medical records indicated he responded to the antibiotics prescribed by Dr. Ballard, and his condition improved.

We have reviewed this record in its entirety. Most of the medical experts, including the MRP, concluded Dr. Ballard breached the applicable standard of care. The trial court was presented with conflicting testimony regarding the appropriateness of Dr. Ballard's treatment of Mr. Frye and whether ordering additional x-rays would have conclusively ruled out the presence of an infection. The trial court considered the medical evidence and weighed the credibility of the witnesses. Based on this record, the trial court could have reasonably found Dr. Ballard was not negligent in the medical care provided to Mr. Frye following the surgical procedure. Consequently, we cannot say the trial court was clearly wrong in its

17

evaluation of the expert testimony or in concluding Dr. Ballard complied with the applicable standard of care in providing medical treatment to Mr. Frye.

In the alternative, plaintiffs contend the trial court failed to address Dr. Ballard's failure to treat Mr. Frye's regional pain syndrome/reflex sympathetic dystrophy ("RSD"). According to plaintiffs, Dr. Ballard breached the applicable standard of care by failing to diagnose and treat Mr. Frye for RSD.

The longstanding jurisprudential rule of law in Louisiana is litigants must raise issues in the trial court, not the appellate courts. Appellate courts generally will not consider issues raised for the first time on appeal. *Mosing v. Domas*, 02-0012 (La. 10/15/02), 830 So. 2d 967; *Segura v. Frank*, 93-1271 (La. 1/14/94), 630 So. 2d 714.

In the petition for damages, plaintiffs alleged Dr. Ballard "negligently and carelessly failed to timely diagnose and treat a soft tissue infection that was allowed to progress to full blown osteomyelitis[.]" Further, the issue before the MRP and the trial court was whether Dr. Ballard breached the applicable standard of care by failing to timely diagnose and treat the infection. The issue of whether Dr. Ballard breached the standard of care by failing to diagnose Mr. Frye with RSD was never presented to the MRP, not raised in the lower court, and will not be considered on appeal.

## CONCLUSION

For the reasons set forth herein, the ruling of the trial court is affirmed. Costs of the appeal are assessed to plaintiffs, Thomas and Sharon Frye.

**AFFIRMED.**

18

**THOMPSON, J., dissenting.**

It is concerning the medical review panel found that the treatment afforded Mr. Frye was a factor in the resulting damages and that it slowed and complicated his recovery. The panel added there was ample evidence to raise to a high level of suspicion that an infectious process was progressing. It appears the post-operative care resulted in osteonecrosis in basically all the bones in Mr. Frye's hand, and that the infection progressed into osteomyelitis. Accordingly, I respectfully dissent from the majority's opinion.